[Civ. No. 38775. Second Dist., Div. Five. Nov. 24, 1971.]

GLORIA M. et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
LOS ANGELES COUNTY et al., Real Parties in Interest.

**COUNSEL**

Lola McAlpin Grant and Ernest L. Aubry for Petitioners.

John D. Maharg, County Counsel, and Harold S. Vites, Deputy County Counsel, for Respondent and for Real Parties in Interest.

**OPINION**

**REPPY, J.**—In this case a referee conducted a hearing on a petition filed by the Los Angeles County Department of Public Social Services (the Department) under Welfare and Institutions Code section 600, subdivision

(a), to adjudge the children of Gloria and Jaime M.[1] dependent children of the court, as did a referee in *Lois R.* v. *Superior Court* (1971) 19 Cal.App. 3d 895 [97 Cal.Rptr. 158], with respect to a child of Lois R. Essentially the basis of the petition herein was that the parents of the children were not exercising proper care for them in that the home had certain unsafe conditions and was untidy and infested with vermin and the children were suffering from certain ailments associated with uncleanliness. As to some of the alleged unsatisfactory conditions there was conflicting evidence, as to others, none; but as to the cause of all of the conditions there were counterveiling contentions and proof or attempted proof.

As in *Lois R., supra,* the mother was in court with counsel,[2] but no member of the Department or attorney representing it[3] was present, althought a deputy probation officer (a Mrs. Thomas) was. As distinguished from *Lois R.,* in the instant matter we have a full record of the proceeding. As in *Lois R.,* the referee conducted the questioning of the Department's witness, cross-examined the witnesses of the parents, and, throughout the hearing, ruled on objections and motions put by counsel and made and then ruled upon objections to questions asked by counsel.

At the conclusion of the hearing the referee found that the allegations of the petitions were true (i.e., that the minors were dependent children) and ordered that the petitions be sustained. The proceedings were continued for disposition, and an order was made (pursuant to § 702) that the minors remain as placed pending the disposition hearing (hereinafter, the interim detention order). There had been a previous temporary detention order, issued by a different referee, placing the minors in an appropriate child care facility. This was the basis for the "as placed" language.

As we found in *Lois R.,* we also find here that the procedure carried out "violates a parent's right to due process of law as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution"; that not only must there be actual fairness in the hearing but there must be the appearance of justice.

---

[1]Jaime M. was not the natural father of Mark G. of whom Gloria M. was the mother.

[2]An attorney from the Western Center on Law and Poverty and a law student appearing pursuant to rules for practical training.

[3]In his letter brief the county counsel speaks of a lawyer who might appear to present the case as representing the minor. We feel that such a lawyer is more appropriately designated as representing the Department appearing in the best interests of the minor. At times, of course, the minor may feel that he is allied with his parents and that the proceeding is adverse to him. That even court personnel may have the reaction that a hearing, in one sense, is adverse to the minor as well as to the parents is reflected by the fact that the reporter's transcript in the instant matter shows counsel as appearing for the minors.

The county counsel suggests that a difference exists between the cases which might prompt this court to let the adjudication in the instant proceeding stand, in that "the referee forthrightly announced that he is called upon to act in a dual role, but clearly regretted this condition," and made an "attempt to balance these roles by permitting the officer to testify in narrative form." It is urged that by this the referee made "a conscious effort to not only do justice but give the appearance of justice." We do not evaluate the overall performance of the referee in this manner. He perhaps commenced with the indicated attitude, although this is doubtful, but as the hearing progressed he did not maintain it. We set out in a footnote excerpts from the record which disclose the problem.[4] In any event we do

---

[4]Police officer called by deputy probation officer. The referee commenced to question him. Counsel suggested that he had misunderstood when the referee had said he was acting both as judge and advocate on behalf of the People, and put it that the referee was going to "conduct your hearing." The referee responded affirmatively, and the attorney entered an objection which was overruled. The referee then observed:

"I wish that the District Attorney was here. I think it would be better for petitioner but unfortunately because of the volume of work . . . we cannot have a District Attorney in every court. It will work to advantage of [the parents] and to the disadvantage of the petitioner because I cannot see the [material] that the prosecuting attorney should see."

The referee asked the deputy probation officer if a deputy district attorney was available and received a negative answer.

The referee then asked a series of questions concerning the officer's experience and his arrival at the apartment. He then asked him to describe what he had seen. The ensuing testimony was chiefly in narrative form.

At one point the attorney interposed an objection to the explanation that the stove burners were not operative because clogged with food, on the ground it was a conclusion. The objection was sustained.

The witness described all the rooms, and said he had been there approximately 20 minutes when the mother arrived. At this point counsel objected to witness going further without specific questions. This was overruled. Nonetheless thereafter interrogation continued mostly on a question and answer basis.

Photos were produced. The officer said on *voir dire* that he was not present when they were taken. On further questioning by the referee it was brought out that they were taken by the science investigation division. A motion to strike was overruled. Counsel asked that the pictures not be admitted. The referee said the request was premature. Then this took place:

"THE COURT: I am operating as a court, naturally. After you finish your voir dire, I am going to make a motion to introduce the pictures.

"MR. BLANK [the attorney]: I understand, thank you, and withdraw what I said until the appropriate time.

"THE COURT: We would like to introduce all of them as one exhibit. Do you have any objection to this group of black and white here?"

There was an objection that the authenticity and chain of custody of the pictures had not been established. The referee said that they had been established. (Although they had not.) Both the court and the attorney put further questions which showed that the officer had received them in the mail. Then this occurred:

"THE COURT: . . . We can take the time and bring . . . the photographer here but ordinarily we just stipulate.

not feel that reviewing courts should or need to be put to the task of making evaluations between, as the county counsel put it in his letter brief, "attempts to conduct [hearings] in a fair manner." We feel, as the county

---

"MR. BLANK: [Y]ou would overrule the objection that they are not properly authenticated?

"THE COURT: Right.

"MR. BLANK: Then we will stipulate. . . ."

Then cross-examination followed. After various questions were asked including some as to how the witness had determined the length of time before the mother arrived, this occurred:

"Q. How do you know this time?

"A. I don't recall checking my watch. I am not sure whether my partner noted the time. I don't recall checking my watch.

"Q. Then you have no reference as to exactly what time it was?

"A. No.

"Q. Is it true it is merely a recollection of what you believe to be the time that passed between the time you arrived and the time Mrs. M arrived at apartment 301?

"THE COURT: Objection. The Court will sustain its own objection. The man testified he doesn't remember.

"MR. BLANK: I am trying to—

"THE COURT: You are getting argumentative. Sustained. Proceed.

Then on a matter of how far the children in the hall were from the door of the apartment this transpired:

"A. They were standing directly next to the window we had discussed earlier.

"MR. BLANK: I will move to strike that as nonresponsive. I am trying to ascertain the distance from the apartment door.

"THE COURT: Overruled. Go ahead.

In answer to the referee's questions as to whether and where the officer had seen the children without clothing, he testified it was at the Department's office and then volunteered that "the children seemed to have a fever." A motion by counsel to strike was "overruled" (denied).

After the officer testified that he had observed a rash on Gloria, the court asked, "How about the other children?" Rather than respond to this the officer added, in part, concerning Gloria that "there seemed to be a deformity of [her] head and hips." Counsel objected. The referee ruled that the officer could testify as to what he saw, but counsel indicated his objection went to the officer's "contributing" (interpreting) what he saw. The referee stated "Overruled. He is not giving medical testimony."

With the conclusion of the officer's testimony the referee asked if there were any other witnesses for petitioner. When the deputy probation officer answered no, the referee announced: "Petitioner rests."

When the defense put on its first witness, a co-tenant of the apartment, the following colloquy took place:

"Q. [Mr. Blank]: During the course of your residence at 1723 West Ninth Street, have you observed the four children of Mrs. M; namely, Mark, Tina, Jimmy, and Gloria?

"A. Three occasions.

"Q. On three occasions you have observed them?

"A. Yes.

"THE COURT: Can you give dates, counsel. I am only interested in June the 4th.

"MR. BLANK: Your Honor, I think we are going to establish that there is overwhelming evidence here the children are taken care of.

counsel suggests we might, "that our system of juvenile justice is better served by requiring counsel, or a trained representative, to appear on behalf of [The Department]." We believe that the problem should be met

---

"THE COURT: The allegations only go to June the 4th. Direct your testimony to that.

"MR. BLANK: I believe the allegations state at various times they have been seen laying [*sic*] in the halls and running naked.

"THE COURT: Hold your testimony to June the 4th.

"MR. BLANK: May I ask for evidence regarding the physical condition of the children which, of course, would—

"THE COURT: If he saw them undressed on that date—if he went in the house, that is about all he should testify to.

"MR. BLANK: Only on that date?

"THE COURT: That's right."

(This ruling would appear to go contrary to the accepted evidence principle that the physical condition of a person a few days or the day before the time in question would tend to prove what it was at the latter time. (Witkin, Cal. Evidence (2d ed. 1966) Circumstantial Evidence, §§ 355 and 357, pp. 315 to 317.)

The referee then cross-examined this witness as to the time factor and whether he had been in the mother's apartment.

The next defense witness was a babysitter. At one point she was asked if she had been present when the mother had requested the manager to fix the plumbing and what the latter had replied. The manager's reply was given that she (the manager) did not want to fix it because she was planning to give the mother another apartment and "the kids" would mess it up anyway. The referee objected and struck the statement as hearsay. (However, the mere fact that the words were said was relevant to the mother's conduct.)

Counsel then asked if the witness had made attempts to get rid of mice in her own apartment, and the following colloquy ensued:

"THE COURT: Objection. That is not material. The Court is going to sustain its own objection. That is not material as to what happened in her apartment.

"MR. BLANK: Your Honor, the allegations—

"THE WITNESS: I think about—

"THE COURT: Just a moment. . . .

"MR. BLANK: The allegations of the petition—

"THE COURT: Make an offer of proof, what you are trying to prove. It has no bearing on the apartment in question.

"MR. BLANK: Your Honor, if I may state what bearing we believe it to have.

"THE COURT: I ask you to make an offer of proof, counsel, if you want.

"MR. BLANK: The offer of proof will be that the mice are throughout the building and that Mrs. M's, apartment being infested with vermin is of no consequence.

"THE COURT: It is a consequence.

"Q. BY MR. BLANK: Mrs. Garcia, have you ever observed mice in Mrs. M's apartment?

"A. Maybe once or twice but I have quite a few in mine.

"THE COURT: Objection. Again, please don't offer any information. Answer counsel's question and no more.

Proceed, counsel. Next question."

The referee then cross-examined this witness as to whether she had seen the children on the day it had fixed on, June 4.

Counsel then called the mother. At one point in the interrogation the referee interrupted to ask if the mother had dressed the children on June 4. (We see this as the appropriate type of occasional intervention which a neutral court can make.)

now in all cases and, that undue confusion and uncertainty would inhere in any other program.

In addition to presenting the problem of the hearing itself, petitioners

---

After considerable testimony given concerning conditions in the apartment counsel asked the mother if she had been a recipient of county welfare over recent years. The following ensued:

"THE COURT: I am going to object. I already expressed, counsel, I don't want you to proceed that way. The last question will be stricken.

"MR. BLANK: The difference between the two questions—

"THE COURT: The difference is that the condition that exists here is not going as to the monetary things. The pictures and the evidence have been proved, whether she had money or not, so restrict your testimony to the things that are in the petition, only."

Concerning intended evidence of the mother's efforts to obtain better quarters the following took place:

"Q. BY MR. BLANK: Mrs. M, do you presently reside at 1723 West Ninth Street?

"THE COURT: Objection. It is not material at this point.

"MR. BLANK: May I have a moment, please, your Honor?

"THE COURT: Proceed, counsel.

"Q. BY MR. BLANK: Mrs. M, have you attempted on or before June 4th, 1971, to find another apartment?

"THE COURT: Objection. Not material."

When counsel asked the mother if the manager had made a vacuum cleaner available to her, the court stated, "Objection. The Court will sustain its own objection."

When counsel asked if any child had ever been injured by a dangerous condition in the apartment, the following ensued:

"THE COURT: Objection. This is not relevant.

"MR. BLANK: I think I would state, your Honor, I feel it is relevant whether or not—

"THE COURT: Overruled. Go ahead. Next question.

"MR. BLANK: No further questions at this time, your Honor.

The referee then cross-examined the mother about the time she was gone from the apartment on June 4 and concerning whether her children were suffering from rashes.

Relating to the intention of counsel to call the father, the following occurred:

"MR. BLANK: Our reason, however, for not calling Mr. M would be in light of the Court's prior ruling that testimony regarding their relationship with the Department of Public Social Services is not relevant.

"THE COURT: It is not in issue here. It may be in another lawsuit but not in this suit.

Any further witnesses?

"MR. BLANK: Nothing further."

Counsel was given permission to present argument. In the course thereof, counsel urged that there was no testimony to show that Gloria's rash was out of the ordinary, and this colloquy occurred:

"THE COURT: I will make an objection. There is testimony it was more than out of the ordinary. It is not ordinary for children to have the rash that was described by the Officer. Go ahead.

"MR. BLANK: Your Honor, we would further state it was the County's responsibility—

"THE COURT: There is no proof. Nothing was brought out so just don't argue that. There is no proof how the County was involved in this so just don't argue things that are not in evidence."

ask us to rule that the preliminary detention order and the interim detention order were noneffective because of having been made by a referee without approval by a judge, citing section 555, Welfare and Institutions Code.[5] How those orders were or had to be signed is no longer of moment. Each has fallen of its own weight because of procedural eventualities.

The application of the preliminary detention order ended when the dependency hearing was concluded and the referee made a finding that the minors were dependent children. The application of the interim detention order has terminated with our decision that the order making the minors dependent children, to which the interim order was ancillary, is a nullity because of the indicated deficiency in due process.

With our remand the case is brought a second time to the procedural point where a petition to have minors declared to be dependent children under section 600 is to be set for hearing (§§ 658, 659 and 660) and a determination made whether, while that hearing is pending, the minors should be detained under sections 630, 632 and 636. If the Department wishes to retry the issue of dependency and to effect the temporary deten-

---

When counsel alluded to "the County's responsibility to present evidence," the following exchange took place:

"THE COURT: The County is not a party to this action. I have laid the rules down and I don't want to keep admonishing counsel. Please limit your argument to the facts and issues that are before this Court.

"MR. BLANK: May I ask how the Court would prefer me to refer to those persons who filed the petition herein?

"THE COURT: As the petitioner."

When counsel argued that "this is overwhelmingly a case of persons who are of meager means" the following colloquy ensued:

"THE COURT: Object. There is no testimony as to means so don't argue that, please. Stay within the facts. There was no evidence of what—they might be millionaires for all this Court knows.

"MR. BLANK: Your Honor, we offered evidence as to whether or not—

"THE COURT: It wasn't accepted.

"MR. BLANK: —as to whether or not they were welfare recipients.

"THE COURT: It was not accepted."

When counsel started to suggest that there was another agency which had some bearing in the matter the referee stated, "There is no proof there is another agency, counsel. Just stay away from that argument."

As counsel came to a close, the following exchange took place:

"MR. BLANK: . . . In light of the presumption and the desires expressed in Section 502 of the Welfare and Institutions Code and in light of such failure of proof, the allegations of the petitions cannot be sustained and the children should be immediately released to the care and custody and control of their parents. .

"THE COURT: Fortunately, I don't agree with you and the Court will sustain all four petitions. The Court will sustain all four petitions and the minors will be detained in their present places of detention."

[5] "No order of a referee removing a minor from his home shall become effective until expressly approved by a judge of the juvenile court."

tion of the children while the hearing is pending, upon the remand of the case it must immediately set up a detention hearing or release the children to petitioners if it has not already done so (§ 632).

Reversed and remanded to the superior (juvenile) court for such further proceedings as the Department may determine to pursue.

Stephens, Acting P. J., and Aiso, J., concurred.