[Civ. No. 31005. Fourth Dist., Div. One. Aug. 22, 1984.]

Conservatorship of the Person of BERTHA FADLEY.
SAN DIEGO COUNTY DEPARTMENT OF MENTAL HEALTH,
Petitioner and Respondent, v.
BERTHA FADLEY, Objector and Appellant.

COUNSEL

Michele Sacks Lowenstein and Leahy & Lowenstein for Objector and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Howard P. Brody, Chief Deputy County Counsel, and Susan J. Boyle, Deputy County Counsel, for Petitioner and Respondent.

OPINION

**STANIFORTH, J.**—The question posed by this appeal is whether a trial court may review a mentally ill patient's treating physician's decision electroconvulsive therapy is warranted, in the course of determining the patient's capacity to give informed consent to that therapy. (Welf. & Inst.

Code, §§ 5326.5, 5326.7, subd. (f).[1]) The statutory scheme and relevant case law make such review inappropriate. That the trial court here engaged in such a review does not require reversal, however, because no prejudice resulted.

## FACTS

Dr. Edward Cherlin, in the course of his treatment of appellant Bertha Fadley, an 87-year-old woman under a conservatorship, determined Fadley required electroconvulsive therapy (ECT) to relieve her profound depression and disorientation. Fadley's condition was manifested in, among other things, her refusal to eat.

ECT may be administered to a person under conservatorship only where specific conditions set forth in section 5326.7 are met.[2] Cherlin therefore, pursuant to section 5326.7, subdivision (a), documented Fadley's need for the therapy in her treatment record. Cherlin then had a committee of two physicians review the treatment record, as section 5326.7, subdivision (b), requires. The physicians unanimously agreed ECT was necessary. Finally, Cherlin, believing Fadley lacked the capacity to give written informed consent to the therapy, petitioned the trial court for an evidentiary hearing on the issue pursuant to section 5326.7, subdivision (f).

---

[1]All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2]Section 5326.7 provides in pertinent part: "Subject to the provisions of subdivision (f) of Section 5325, convulsive treatment may be administered to an involuntary patient, including anyone under guardianship or conservatorship, only if: [¶] (a) The attending or treatment physician enters adequate documentation in the patient's treatment record of the reasons for the procedure, that all reasonable treatment modalities have been carefully considered, and that the treatment is definitely indicated and is the least drastic alternative available for this patient at this time. Such statement in the treatment record shall be signed by the attending and treatment physician or physicians. [¶] (b) A review of the patient's treatment record is conducted by a committee of two physicians, at least one of whom shall have personally examined the patient. One physician shall be appointed by the facility and one shall be appointed by the local mental health director. Both shall be either board-certified or board-eligible psychiatrists or board-certified or board-eligible neurologists. This review committee must unanimously agree with the treatment physician's determinations pursuant to subdivision (a). Such agreement shall be documented in the patient's treatment record and signed by both physicians. . . . [¶] (f) If either the attending physician or the attorney believes that the patient does not have the capacity to give a written informed consent, then a petition shall be filed in superior court to determine the patient's capacity to give written informed consent. The court shall hold an evidentiary hearing after giving appropriate notice to the patient, and within three judicial days after the petition is filed. At such hearing the patient shall be present and represented by legal counsel. If the court deems the above-mentioned attorney to have a conflict of interest, such attorney shall not represent the patient in this proceeding. [¶] (g) If the court determines that the patient does not have the capacity to give written informed consent, then treatment may be performed upon gaining the written informed consent as defined in Sections 5326.2 and 5326.5 from the responsible relative or the guardian or the conservator of the patient."

At the hearing both Cherlin and Fadley testified. Cherlin explained his belief Fadley's conditions rendered her unable to give informed consent:

"Q. [By deputy county counsel] In your opinion, is the patient's condition such as to render her unable to give informed consent?

"A. Yes.

"Q. What are the reasons for that opinion, doctor?

"A. Her condition has shown itself in the form of grossly delusional thinking; inability to care for her basic needs, including food, clothing, and shelter; agitation; apparently disturbing thoughts as shown by her behavior on the unit where she resides currently at Grossmont Hospital; negative attitude; and continued evidence of inability to eat properly. She has been refusing food."

Cherlin also testified Fadley appeared unable to understand his explanation to her of why she needed the therapy and refused to listen to him as he discussed the therapy with her. Fadley in turn testified as follows:

"Q. [By Fadley's counsel] You have had ECT treatment before?

"A. No, I don't need it.

"Q. And why do you think you don't need it?

"A. Because I'm told my mind is all right. My mind is perfect.

"Q. Are you taking some medication now?

"A. No.

"Q. Where are you staying now?

"A. At the Grossmont.

"Q. And where were you living before?

"A. Thirty-seven—

"Q. That was the board-and-care?

"A. Yes, that place.

"Q. Do you want to go back to that place again?

"A. No. I would rather go to my sister's house, 2824 29th Street. That's my sister's house.

"Q. Are there any other reasons that you don't want to take—don't want any electroconvulsive shock treatments?

"A. I don't need them.

"Q. Are you afraid of them at all?

"A. My mind is perfectly okay.

"Q. Did you hear the doctor discuss some of these matters?

"A. No, I never did.

"Q. You never heard them?

"A. He never discussed them with me.

"Q. When you were just outside in the hallway, the doctor was reading some information to you.

"Do you remember that?

"A. Nothing wrong with my mind.

"Q. Okay. But did you hear what the doctor read to you?

"A. What?

"Q. Did you understand any of it that he read to you about electroconvulsive—

"A. No. I didn't understand it because it isn't true. There is nothing on my mind, never was.

"[Fadley's counsel]: I have nothing further of my client. Just a couple— one more question of the doctor.

"[Fadley]: Nothing wrong with my mind."

Cherlin was further examined by the court as follows, over objection of Fadley's counsel:

"THE COURT: Dr. Cherlin, what will happen, or what is your prognosis if she is not given the treatment that you have recommended at this point in time?

". . . . . . . . . . . . . . . . . . . . . . . . . .

"DR. CHERLIN: Prognosis is very guarded without this type of treatment because Mrs. Fadley is not eating without great coercion; and if she doesn't change in some dramatic fashion, then she'll probably need to be tube-fed at some point. She is losing weight. She is quite aged. Her physical health will only get worse, and this could compromise her capacity to withstand daily—just daily living. And so I'm very concerned about her from that standpoint." The court then ruled Fadley was incapable of giving informed consent to the therapy. The court further determined:

"[Y]ou need the treatment, and all other least drastic modalities of treatment have been exhausted that might help you in your condition; and electroconvulsive therapy treatment is the least drastic treatment that can be given to you at this time, that may help you."

Fadley appeals, claiming the trial court's consideration of the necessity for the therapy caused reversible error. Shortly after the trial court's ruling, Fadley received the therapy.

## DISCUSSION

### I

■ The threshold issue here is whether we are barred from considering this appeal because Fadley has already received the treatments. County counsel rightfully does not contend for dismissal of the appeal. Because "[t]he instant case poses issues of public interest that are capable of repetition, yet avoiding review (*Ferrara* v. *Belanger,* 18 Cal.3d 253, 259 . . .) [and] [t]he statute involved is [relatively] new, there is a paucity of authority and interpretation,"[3] we retain jurisdiction over the controversy and address Fadley's contention of error. (*Conservatorship of Buchanan* (1978) 78 Cal.App.3d 281, 285-286 [144 Cal.Rptr. 241], disapproved on another point in *Conservatorship of Early* (1983) 35 Cal.3d 244, 255 [197 Cal.Rptr. 539, 673 P.2d 209]; see also *In re William M.* (1970) 3 Cal.3d 16, 23, fn.

[3]Section 5326.7 was added by Statutes 1976, chapter 1109, section 8, page 4997.

14 [89 Cal.Rptr. 33, 473 P.2d 737]; *City of Monterey* v. *California Coastal Com.* (1981) 120 Cal.App.3d 799, 805-806 [174 Cal.Rptr. 798].)

## II

The trial court considered Cherlin's testimony regarding the necessity for therapy and explicitly found all other less drastic modes of treatment had been exhausted and Fadley in fact needed ECT. A reading of section 5326.7 suggests the issue before the court at a subdivision (f) evidentiary hearing, however, is a narrow one: Does the patient have the ability to give written consent to the proposed therapy. Not at issue in the hearing is whether ECT is definitely indicated and the least drastic alternative available to the patient. The Legislature has, pursuant to section 5326.7, subdivisions (a) and (b), left this determination to the treating physician and review thereof to a two-physician review committee, because it is "a purely medical determination, which is within a doctor's professional judgment." (*Aden* v. *Younger* (1976) 57 Cal.App.3d 662, 677 [129 Cal.Rptr. 535].)

The court's duty is "to determine the patient's capacity to give written informed consent" to the therapy. (§ 5326.7, subd. (f).) Here, Cherlin's testimony explaining his determination Fadley needed ECT was properly considered in assessing Fadley's ability to consent to the therapy.

Cherlin testified Fadley's health would be greatly jeopardized without the therapy and she had been informed of the fact; Fadley's refusal to undergo ECT because she did not need the therapy and had been told her mind was "all right" spoke to her inability to comprehend Cherlin's explanation of her need for the therapy and thus to her capacity to give written informed consent to it. Section 5326.5, subdivision (c), directs that a patient must be able to *"understand, or knowingly and intelligently act upon, the information"* related to the therapy given by the treating physician in order to be deemed capable of giving informed consent." (Italics added.)

## III

■ The trial court's consideration of Cherlin's prognosis should Fadley not receive ECT was proper, its findings ECT was required and the least drastic available treatment were not. The error was harmless, however. Fadley can demonstrate no prejudice from the court's findings. All the evidence adduced at the evidentiary hearing suggested Fadley could not knowingly and intelligently act upon the information given by Cherlin regarding the therapy. Fadley herself testified she could not remember Cherlin had just spoken with her about her need for the therapy. Fadley demonstrated complete incomprehension of the information he had provided her in testi-

fying she did not need ECT because she had been "told [her] mind [was] all right. [Her] mind [was] perfect."

A result more favorable to Fadley—a finding she was able to give written informed consent to the therapy—would not have been reached absent the trial court's misapprehension of the nature of the section 5326.7, subdivision (f), evidentiary hearing. (*Brokopp* v. *Ford Motor Co.* (1977) 71 Cal.App.3d 841, 853 [139 Cal.Rptr. 888, 93 A.L.R.3d 537].)

Judgment affirmed.

Cologne, Acting P. J., and Wiener, J., concurred.