[No. D045800. Fourth Dist., Div. One. Oct. 26, 2005.]

Conservatorship of the Person of PAMELA J.
SAN DIEGO HEALTH & HUMAN SERVICES BUREAU, Petitioner and Respondent, v.
PAMELA J., Objector and Appellant.

**Counsel**

Linda Fabian, under appointment by the Court of Appeal, for Objector and Appellant.

No appearance for Petitioner and Respondent.

**Opinion**

**HUFFMAN, Acting P. J.**—This appeal presents issues concerning the conduct of the evidentiary hearing under Welfare and Institutions Code[1] section 5326.7, subdivision (f), part of the Lanterman-Petris-Short Act (LPS or Act; § 5000 et seq.) to determine the capacity of a patient under the Act to give or refuse to give written informed consent to electroconvulsive treatment (ECT).

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

On January 13, 2005, the trial court found Pamela J., a conservatee under the LPS, did not have the capacity to give such written informed consent to ECT, and ordered that her father may consent to or refuse this shock treatment on her behalf. (§ 5326.7, subds. (f) & (g).) On January 20, 2005, Pamela appealed, contending the court prejudicially erred in conducting the ECT evidentiary hearing regarding her capacity to give written informed consent in her absence because both section 5326.7, subdivision (f) and constitutional due process mandate her presence. She also claimed the court violated her due process rights by acting in the dual capacity of fact finder and advocate during that hearing and there was no substantial evidence to support the court's conclusion by clear and convincing evidence that she did not have the capacity to consent.

Although we find the court may properly make relevant inquiries at the evidentiary hearing under section 5326.7, subdivision (f), part of the LPS without violating the patient's due process rights, we conclude the statutory scheme clearly provides that the court may not make the ultimate determination of the patient's capacity or incapacity to give written informed consent for ECT without the presence of the patient. Because the court in this case decided the issue without Pamela being present, it prejudicially erred. We, therefore, reverse the January 2005 order finding Pamela incapable of giving such informed consent.

I

PRELIMINARY MATTERS

Before setting out the factual and procedural background for our discussion, we note several threshold matters. During the pendency of this appeal, Pamela filed requests to augment the record to include documents found in her superior court file relating to the establishment of her LPS conservatorship in 2004 and its proposed reestablishment, and to take judicial notice of documents entered after the appealed ruling which show the reestablishment of her LPS conservatorship in March 2005 and a court order finding she had the capacity to consent to ECT on March 8, 2005. Both requests were deferred for consideration with this appeal. At this time we grant the requests to augment the record to include the documents predating the hearing at issue in this case (Cal. Rules of Court, rule 12(a)(1)(A)), and take judicial notice of the two documents reflecting events that occurred after the order which is the subject of this appeal (Evid. Code, §§ 452, subd. (d), 459, subd. (a); Cal. Rules of Court, rule 22(a)).

■ As Pamela notes, these additional documents reveal this appeal from the court's January 2005 ruling on Pamela's capacity to consent to ECT is technically moot at this point because she has already had the treatments and has just recently been found to have the capacity to consent to another round of ECT.[2] However, because the issue of whether Pamela is capable of giving consent to yet another session of ECT while she remains a conservatee under the LPS is likely to reoccur as section 5326.7, subdivision (d) provides consent for ECT may not exceed 30 days and additional treatments "shall require a renewed written informed consent," should Pamela's physician or attorney believe she does not have the capacity to give written informed consent to proposed additional ECT, a new petition must be filed in the superior court and another evidentiary hearing held on her capacity to do so. Given the short time frames for petitioning the court for such a determination of a patient's capacity, "the issues they raise are in the class of those ' " ' "capable of repetition, yet evading review" ' " ' which may be addressed even though they are moot. [Citation.]" (*Department of Corrections v. Office of Admin. Hearings* (1998) 66 Cal.App.4th 1100, 1106 [78 Cal.Rptr.2d 473].) Moreover, because the issues in this case are important to the fundamental rights of all LPS patients whose treatment may include proposed ECT, we exercise our discretion to retain the matter and decide the issues. (*Ibid.*; see also *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 524, fn. 1 [110 Cal.Rptr.2d 412, 28 P.3d 151] (*Wendland*); *Conservatorship of Fadley* (1984) 159 Cal.App.3d 440, 445–446 [205 Cal.Rptr. 572] (*Fadley*).)

■ Another preliminary matter is raised by the fact no respondent's brief has been filed in this case. Although the Office of County Counsel has been the attorney for respondent San Diego County Health & Human Services Bureau in many of Pamela's LPS conservatorship proceedings, and was served with notice of appeal and requests for augmentation and judicial notice, county counsel was not present at the hearing at issue in this case and has advised the court it generally does not participate in hearings related to a hospital treating a patient with ECT. Although the ECT petitioner, Dr. Yaraslov Kushnir, was served with the requests to augment the appellate record and to take judicial notice, it is unclear whether he was served with the notice of appeal. In any event, he also has not filed a respondent's brief. We,

---

[2] Because a reversal will usually come too late for a patient who appeals a determination of lack of capacity to consent for ECT, this court has previously noted counsel should request a stay of the lower court's order at the time of filing the appeal (*Conservatorship of Waltz* (1986) 180 Cal.App.3d 722, 734, fn. 15 [227 Cal.Rptr. 436] (*Waltz*); *Lillian F. v. Superior Court* (1984) 160 Cal.App.3d 314, 316–317 [206 Cal.Rptr. 603] (*Lillian F.*)), or upon the filing of a petition for a writ of habeas corpus, which may also properly be utilized to enforce the rights of a conservatee to refuse ECT under the LPS. (See *In re Gandolfo* (1984) 36 Cal.3d 889, 898 [206 Cal.Rptr. 149, 686 P.2d 669].)

therefore, proceed under California Rules of Court, rule 17(a)(2), which allows us to "decide the appeal on the record, the opening brief, and any oral argument by the appellant." Because Pamela has not requested oral argument, we examine the record as augmented on the basis of her opening brief, and " 'reverse only if prejudicial error is found.' [Citations.]" (*In re Bryce C.* (1995) 12 Cal.4th 226, 232–233 [48 Cal.Rptr.2d 120, 906 P.2d 1275].)

II

## FACTUAL AND PROCEDURAL BACKGROUND

Pamela was found to be gravely disabled and placed under an LPS conservatorship of her person on February 27, 2004. Shortly after a petition was filed to reestablish the conservatorship, Pamela's treating physician, Dr. Kushnir, filed a petition under section 5326.7, subdivision (f) to have the court conduct an evidentiary hearing on whether Pamela was capable of giving written informed consent to the ECT, which he recommended. The petition alleged a committee of physicians also concurred with Kushnir's recommendation and her attorney alleged she did not have the capacity to give such consent to the recommended treatment.

At the beginning of the ECT hearing on January 13, 2005, Pamela's attorney apprised the court that Pamela was not there and he did not believe the matter could go forward without her because the statutory provision for ECT hearings stated the patient "shall be present." The court noted Pamela had been given notice of the hearing and if she did not want to be there, "she is not forced to be here." When the court then inquired from Kushnir whether he was involved in transporting Pamela to court, Kushnir said she did not want to come, she refused to do so, and "unless they tied her up and [brought] her screaming and yelling, which . . . is counterproductive, that's the only way we could get her here." Over counsel's continuing objection, the court stated the matter would proceed in Pamela's absence.

Counsel then requested a continuance until either Pamela could come to court or the court could go to her because he thought she was very close "to being determined to be able to give consent. . . ." Counsel explained that when he had talked to Pamela the day before the hearing she said she understood what ECT is, "she had it before and she was not objecting to it[, but s]he only wants three shock treatments, not six." She also knew the ECT could cause memory loss. Counsel conceded he could not vouch for her condition today, saying Pamela was "fragile in a lot of ways, but yesterday she was pretty clear. And so I think it's tough for the judge to know whether

she's in a clear mood and can agree to consent to ECT or whether she's so muddled she can't consent [in her absence]." Pamela had told counsel she wanted to be at the hearing, but this morning she had changed her mind. The court reiterated that the matter would "proceed in her absence."

Kushnir was then sworn to give testimony on the circumstances regarding trying to get Pamela to attend the hearing that day. When Kushnir had talked to her the night before, she said she did not want to go and he told her, "Well, if you don't want to go you don't have to." This morning Pamela insisted she did not want to come to court. The alternative would have been to "get a gurney, call the ambulance and tie her up in the gurney and drag her down here. She believes people are raping her, and if she comes in it's because of some delusional beliefs."

Although counsel agreed with the doctor it would be detrimental to drag Pamela to court, he noted he had attended ECT hearings before where the patient did not want to come to court and each time the court had gone to where the patient was located, and requested the court go to her. The court was "not prepared to displace itself and go to her under these circumstances." After questioning counsel and finding he had no conflict in representing Pamela at this ECT hearing, the court again called Kushnir to the stand, and counsel stipulated to Kushnir's qualifications.

After the court asked Kushnir several questions, counsel objected "to the court proceeding on behalf of the petitioner, kind of acting as his attorney since he's filed a petition. The burden is on him to go forward; it's not up to the court to act as his attorney in these proceedings in bringing his matters forward." The trial judge overruled the objection, stating: "I'm exercising the authority that the judge has to control the presentation of testimony. I'm not abusing my ability or my position as judge. I'm not becoming the attorney for petitioner who is not represented in this case. [¶] What I'm doing is making sure we get the information in a rapid and concise manner so we can ascertain the truth, and part of that process will certainly be your ability to actually cross examine this witness. . . ." The court noted counsel could object to any question.

Kushnir had known Pamela "off and on for about three years" and had formed a diagnosis based upon examining her and information in reports from social service, nurses, conservators, and her father. Counsel stipulated to Kushnir's diagnosis that Pamela suffered from bipolar affective disorder with psychotic features. Pamela's symptoms the night before the hearing included her saying Kushnir had taken her out to the Bahamas, had raped her and then saying he was gay and she wanted people to know he was gay. His treatment plan for Pamela included ECT.

When the court asked what other treatments Kushnir had tried or considered, counsel objected that the question was "irrelevant to the issue of whether the client has the ability to give consent." The court overruled the objection. When Kushnir described Pamela's response to ECT performed two years earlier, counsel again objected on grounds of relevancy, stating the issue is "current condition," which was also overruled. Kushnir explained Pamela had asked him two years ago "that if she ever got sick that [he] would recommend ECT before she went into a severe psychosis." Pamela then went to another hospital where ECT was not performed because of insurance reasons and was subsequently placed in another facility for almost a year "while her condition deteriorated to the point where she was striking, hitting people, believing they are having sex with her." She was then transferred to Kushnir's facility and "has been offered all the modalities known for her diagnosis, mood stabilizers, anti-psychotics, antidepressants, but when she is presented with them none of the technicians . . . can touch her." Kushnir opined ECT was necessary "[e]ssentially to save her life and quality of life she has. Otherwise she will be doomed to further locked care." He knew of no other less drastic alternative and had considered the side effects of ECT before recommending it.

Over continuing relevancy objections, Kushnir stated he had given Pamela a copy of the consent form for ECT and had explained in detail the form information, but he did not believe she could understand it or could "knowingly and intelligently act on [such] information concerning ECT so as to give informed consent." Kushnir identified Pamela's father as the responsible close relative who would be able to give informed consent on her behalf. Kushnir also answered questions as to whether he had the agreement for the necessity of ECT as the least drastic alternative available for Pamela by "a committee of at least two physicians" who had reviewed her treatment, whether they had noted and signed such agreement on her record, whether they had examined her personally, whether at least one was appointed by the facility where Pamela is confined and the other by the director of mental health, and whether both were board certified psychiatrists.

On cross-examination, Kushnir conceded Pamela had had moments when she was coherent the night before the hearing, but she then countered with "remarks accusing [him] of raping her[, saying] she owns the hospital[, and she] wants every smoke break that is available at her command." He also agreed she had seemed to understand the night before, but he opined she was not as coherent that morning before the hearing because she was "very adamant in wanting her own way. . . ." Although her responses were symptomatic of her illness, Kushnir "was hoping [Pamela] will respond like she did before when ECT was like magic, brought her back to a woman who

was driving a car, attending physical activities, and wanting to live in her own apartment and handle her money appropriately." Even though Pamela had told him ECT had helped her, and said she would have three sessions and then stop, Kushnir did not believe she was really capable of understanding because she maintained she was not sick. He did not think she could agree to treatment if she did not believe she was sick.

When the court asked counsel if he had any evidence to present, counsel stated he could not present her side without her presence and again objected to the proceedings going ahead without her. Counsel pointed out that on the narrow issue of Pamela's capacity to consent, even the doctor had agreed she had consented to some ECT sessions, but that it was the court's decision, not the doctor's, to determine "the depth of her understanding and agreement. . . ."

The court found Pamela had received "appropriate notice and was not present with counsel, her presen[ce] being waived in accordance with the doctor's declaration, the requirements of . . . section 5326.7[, subdivision] (f) have been satisfied. [¶] The patient does not currently have the capacity to give or refuse to give informed, written consent to ECT. Therefore the court appoints [Pamela's father] as a responsible party with authority to give or refuse written consent for ECT for [Pamela]."[3]

## III

## DISCUSSION

Because Pamela's contentions essentially challenge how the trial court conducted the evidentiary hearing on her capacity to give written informed consent to ECT, we briefly discuss the LPS and its pertinent provisions which regulate the use of ECT before addressing her assertions.

### A. *The LPS and Pertinent Provisions Regarding ECT*

█ In a nutshell, the LPS "is intended to provide prompt, short-term, community-based intensive treatment, without stigma or loss of liberty, to individuals with mental disorders who are either dangerous or gravely disabled. [Citation.]" (*Ford v. Norton* (2001) 89 Cal.App.4th 974, 977 [107 Cal.Rptr.2d 776].) The Act " 'represents a delicate balance "between the medical objectives of treating sick people without legal delays and the equally valid legal aim of insuring that persons are not deprived of

---

[3] The written order incorrectly states the hearing was January 11, 2005, and that "the patient . . . was present at such hearing with . . . her attorney."

their liberties without due process of law." [Citation.]' [Citations.]" (*Conservatorship of Kevin M.* (1996) 49 Cal.App.4th 79, 89 [56 Cal.Rptr.2d 765].) It " 'scrupulously protect[s] the rights of involuntarily detained mentally disordered persons' [citation]" (*Edward W. v. Lamkins* (2002) 99 Cal.App.4th 516, 526 [122 Cal.Rptr.2d 1] (*Edward W.*)), explicitly guaranteeing them "a number of legal and civil rights, and provides that involuntarily detained patients retain all rights not specifically denied under the LPS. [Citations.]" (*Ibid.*)

■ In general, with regard to decisions affecting the medical treatment of patients under the LPS, incompetence in making such decisions may not be presumed solely on the basis of their hospitalization. (§§ 5331,[4] 5326.5, subd. (d);[5] *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1315 [271 Cal.Rptr. 199] (*Riese*).) California's common law and the constitutional right to privacy have been held to protect "the right of persons not adjudicated incompetent to give or withhold consent to medical treatment. . . ." (*Id.* at p. 1317; see also *Wendland, supra,* 26 Cal.4th at pp. 530–531.) Our Legislature has made it very clear that the patient's right to agree to or refuse a recommended treatment does not vanish even when the patient is involuntarily committed. (*Riese, supra,* 209 Cal.App.3d at p. 1324.) An LPS conservatee thus not only retains "the right to refuse or consent to treatment related specifically to his or her being gravely disabled, and to routine medical treatment, . . . [a] conservatee specifically has the right to refuse treatment with antipsychotic medication or convulsive treatment unless judicially determined to lack capacity to refuse treatment [citations]." (*Edward W., supra,* 99 Cal.App.4th at p. 534, fn. omitted; see also *Waltz, supra,* 180 Cal.App.3d at p. 733.)

As explained in *Lillian F., supra,* 160 Cal.App.3d 314, the Legislature has "established a variety of procedural safeguards surrounding the use of [ECT] for voluntarily or involuntarily detained patients [under the LPS]," (*id.* at p. 317) due to its recognition of the "intrusive and possibly hazardous [nature of such shock] treatment." (*Aden v. Younger* (1976) 57 Cal.App.3d 662, 672 [129 Cal.Rptr. 535].) In amending the provisions of the LPS dealing with the administration of ECT in 1976, the Legislature "expressly stated that it was doing so in recognition of 'the danger of a violation of a mental patient's constitutional right to privacy,' and that it intended 'to assure that the integrity and free choice of every such patient is fully recognized and

---

[4] Section 5331 provides in relevant part: "No person may be presumed to be incompetent because he or she has been evaluated or treated for mental disorder . . . , regardless of whether such evaluation or treatment was voluntarily or involuntarily received."

[5] Section 5326.5, subdivision (d) provides with regard to informed consent: "A person confined shall not be deemed incapable of refusal solely by virtue of being diagnosed as a mentally ill, disordered, abnormal, or mentally defective person."

protected.' [Citation.]" (*Northern Cal. Psychiatric Society v. City of Berkeley* (1986) 178 Cal.App.3d 90, 99, 105 [223 Cal.Rptr. 609].)

Specifically, section 5325 provides in pertinent part that a person "involuntarily detained for evaluation or treatment under provisions of this part . . . shall have the following rights . . . : [¶] . . . [¶] (f) [t]o refuse convulsive treatment including, but not limited to, any electroconvulsive treatment, any treatment of the mental condition which depends on the induction of a convulsion by any means, and insulin coma treatment." Subject to these rights, section 5326.7 of the Act provides "convulsive treatment may be administered to an involuntary patient, including anyone under guardianship or conservatorship, only if" certain requirements are met.[6] Subdivision (f) of section 5326.7 states in relevant part that "[i]f either the attending physician

---

[6] Section 5326.7 provides: "Subject to the provisions of subdivision (f) of Section 5325, convulsive treatment may be administered to an involuntary patient, including anyone under guardianship or conservatorship, only if: [¶] (a) The attending or treatment physician enters adequate documentation in the patient's treatment record of the reasons for the procedure, that all reasonable treatment modalities have been carefully considered, and that the treatment is definitely indicated and is the least drastic alternative available for this patient at this time. Such statement in the treatment record shall be signed by the attending and treatment physician or physicians. [¶] (b) A review of the patient's treatment record is conducted by a committee of two physicians, at least one of whom shall have personally examined the patient. One physician shall be appointed by the facility and one shall be appointed by the local mental health director. Both shall be either board-certified or board-eligible psychiatrists or board-certified or board-eligible neurologists. This review committee must unanimously agree with the treatment physician's determinations pursuant to subdivision (a). Such agreement shall be documented in the patient's treatment record and signed by both physicians. [¶] (c) A responsible relative of the person's choosing and the person's guardian or conservator, if there is one, have been given the oral explanation by the attending physician as required by Section 5326.2. Should the person desire not to inform a relative or should such chosen relative be unavailable, this requirement is dispensed with. [¶] (d) The patient gives written informed consent as defined in Section 5326.5 to the convulsive treatment. Such consent shall be for a specified maximum number of treatments over a specified maximum period of time not to exceed 30 days, and shall be revocable at any time before or between treatments. Such withdrawal of consent may be either oral or written and shall be given effect immediately. Additional treatments in number or time, not to exceed 30 days, shall require a renewed written informed consent. [¶] (e) The patient's attorney, or if none, a public defender appointed by the court, agrees as to the patient's capacity or incapacity to give written informed consent and that the patient who has capacity has given written informed consent. [¶] (f) If either the attending physician or the attorney believes that the patient does not have the capacity to give a written informed consent, then a petition shall be filed in superior court to determine the patient's capacity to give written informed consent. The court shall hold an evidentiary hearing after giving appropriate notice to the patient, and within three judicial days after the petition is filed. At such hearing the patient shall be present and represented by legal counsel. If the court deems the above-mentioned attorney to have a conflict of interest, such attorney shall not represent the patient in this proceeding. [¶] (g) If the court determines that the patient does not have the capacity to give written informed consent, then treatment may be performed upon gaining the written informed consent as defined in Sections 5326.2 and 5326.5 from the responsible relative or the guardian or the conservator of the patient. [¶] (h) At any time during the course of treatment of a person who has been deemed incompetent, that person shall have

or the attorney [for the patient] believes that the patient does not have the capacity to give a written informed consent, then a petition shall be filed in superior court to determine the patient's capacity to give written informed consent. The court shall hold an evidentiary hearing after giving appropriate notice to the patient, and within three judicial days after the petition is filed. At such hearing the patient shall be present and represented by legal counsel."

■ The court's sole duty at the hearing is " 'to determine the patient's capacity to give written informed consent' " to the proposed ECT. (*Fadley, supra*, 159 Cal.App.3d at p. 446.) "Section 5326.5, subdivision (c), directs that a patient must be able to 'understand, or knowingly and intelligently act upon, the information' related to the therapy [proposed] by the treating physician in order to be deemed capable of giving informed consent." (*Fadley, supra*, 159 Cal.App.3d at p. 446, italics omitted.) The court is required to make its determination as to whether the patient lacks the capacity to consent to or refuse ECT by "clear and convincing evidence." (*Lillian F., supra*, 160 Cal.App.3d at p. 324.) This standard recognizes the balance between the state's " 'profound interest in insuring appropriate treatment for the conservatee as well as access to such treatment even for those who by virtue of their illness are incapable of understanding the benefit of the treatment and giving consent to it, [and the] equal interest in insuring that such a serious and intrusive procedure is not forced on a conservatee who does not want it and who is simply in disagreement with his [or her] conservator and his [or her] physicians.' [Citation.]" (*Waltz, supra*, 180 Cal.App.3d at pp. 733–734.)

Further, in making its determination, the court must consider medical evidence regarding the patient's condition and prognosis as it relates to capacity to consent, but must not consider whether ECT is definitely necessary or is the least drastic treatment alternative available. (*Waltz, supra*, 180 Cal.App.3d at p. 728.)

Where the court finds the patient does not have the capacity to give written informed consent, "treatment may be performed upon gaining the written informed consent . . . from the responsible relative or the guardian or the conservator of the patient." (§ 5326.7, subd. (g).) However, "[n]o convulsive treatment shall be performed if the patient . . . is deemed to be able to give informed consent and refuses to do so." (§ 5326.85.)

With this statutory background in mind, we turn to Pamela's contentions on appeal.

---

the right to claim regained competency. Should he do so, the person's competency must be reevaluated according to subdivisions (e), (f), and (g)."

B. *The Presence of the Patient*

Pamela contends the trial court prejudicially erred and denied her constitutional due process when it determined the matter of her capacity to give written informed consent to ECT in her absence because the plain terms of section 5326.7, subdivision (f) state the patient "shall be present." We agree.

■ Our role in interpreting a statute is to " ' "ascertain the intent of the Legislature so as to effectuate the purpose of the law." [Citations.] In determining the Legislature's intent, a court looks first to the words of the statute. [Citation.] . . . [¶] . . . [The] court gives the language its usual, ordinary meaning. [Citations.] If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs. [Citations.]' [Citation.] ' "The words, however, must be read in context, considering the nature and purpose of the statutory enactment." [Citation.] In this regard, sentences are not to be viewed in isolation but in light of the statutory scheme. [Citation.]' [Citation.]" (*Lewis v. Superior Court* (1999) 19 Cal.4th 1232, 1245 [82 Cal.Rptr.2d 85, 970 P.2d 872].)

■ As noted above, subdivision (f) of section 5326.7 specifically states with regard to the evidentiary hearing required to be held to determine an involuntary patient's capacity to give written informed consent for ECT, that "[a]t such hearing *the patient shall be present* and represented by legal counsel." (Italics added.) Generally the term "shall" connotes the provision is mandatory. (Webster's 9th New Collegiate Dict. (1988) p. 1081, defining "shall" in part as: "b. used in laws, regulations, or directives to express what is mandatory.") Section 15 also provides that as used in the Welfare and Institutions Code, the term "shall" is mandatory. Because subdivision (f) of section 5326.7 is included in the Welfare and Institutions Code, the plain, unambiguous meaning of the above italicized words within that statutory framework, as well as in ordinary usage, is that the patient must be present at the ECT hearing.

Not only does a determination that the patient's presence is mandatory at such evidentiary hearing comport with the Legislature's intent to provide stringent safeguards for protecting the patient's privacy and constitutional rights to refuse the intrusive and potentially hazardous ECT if the patient is found to be capable of consent (§§ 5326.5, 5326.7, 5326.85; *Waltz, supra*, 180 Cal.App.3d at pp. 733–734), such mandatory determination is also supported by the omission of any provision in the statutes pertaining to ECT for waiving the patient's presence at that ECT hearing. The Legislature knows how to include specific provisions for the waiver of a person's presence, and has done so in other LPS proceedings, i.e., for the establishment and reestablishment of LPS conservatorships (§§ 5350, 5365.1; Prob.

Code, § 1825), and for review hearings regarding certification for intensive treatment (§ 5256.3). The fact the Legislature did not likewise include a provision for waiver of the patient's presence for the evidentiary hearing on capacity in subdivision (f) of section 5326.7 provides further evidence of its intent to make the patient's presence mandatory.

■ As we noted years ago in *Fadley, supra,* 159 Cal.App.3d 440, the medical decision by the treating physician and review committee that ECT is indicated and the least drastic alternative treatment available for an involuntary patient is not at issue at the evidentiary hearing to determine the patient's capacity to give written informed consent to such treatment. (*Id.* at p. 446; *Waltz, supra,* 180 Cal.App.3d at p. 728.) Rather it is the physician's medical opinion or the opinion of the patient's counsel that the patient is not capable of understanding what ECT entails and of consenting or refusing the treatment which is the subject of judicial evaluation before the patient's right to have the final say in his or her medical treatment may be removed and placed in the statutorily designated responsible relative, guardian or conservator. (§ 5326.7, subds. (f) & (g); *Riese, supra,* 209 Cal.App.3d at p. 1324.) Because the Legislature did not provide some type of mechanism for the court to merely accept the physician's or counsel's opinion on the subject, we believe it meant what it said when it provided in subdivision (f) of section 5326.7 that the patient shall be present at the evidentiary hearing to determine his or her capacity to consent to or refuse ECT.

■ The requirement of the patient's presence at the ECT capacity hearing not only ensures the patient's due process rights to be heard, but also provided the most significant evidence in aiding the court in its determination whether the patient is competent to give informed consent. As one court has noted, the judicial determination of capacity to give consent "should focus primarily upon three factors: (a) whether the patient is aware of his or her situation . . . ; (b) whether the patient is able to understand the benefits and risks of, as well as the alternatives to, the proposed intervention . . . ; and (c) whether the patient is able to understand and to knowingly and intelligently evaluate the information required to be given patients whose informed consent is sought [citation] and otherwise participate in the treatment decision by means of rational thought processes." (*Riese, supra,* 209 Cal.App.3d at pp. 1322–1323.) Unless the patient is present at the hearing, the court will be hard-pressed to answer these questions.

Although our research has disclosed no other provision in the LPS specifically stating that the presence of the patient is required at a hearing to determine the patient's capacity to refuse medical treatment, we note that sections 5332 through 5334, added to the LPS in 1991 (Stats. 1991, ch. 681, §§ 3–6, pp. 3078–3081), require the hearing conducted to determine the

capacity of an LPS patient to consent to or refuse antipsychotic medication must be "in an appropriate location at the facility where the person is receiving treatment, and shall be held in a manner compatible with, and the least disruptive of, the treatment being provided to the person." (§ 5334, subd. (b).) It also requires that at the conclusion of such capacity hearing, the patient must be given verbal notification of the results. (§ 5334, subd. (d).) These provisions were added in response to the decision in *Riese, supra,* 209 Cal.App.3d 1303, which looked to the LPS provisions at issue here to hold a similar capacity hearing must be held when the competence of an LPS patient to consent to or refuse antipsychotic medication arises. (*Id.* at p. 1322.) From these sections, it can be gleaned that the court hearing the matter at the patient's location will at least observe the person whose capacity is at issue to aid in such judicial determination. Certainly, no less is required here where an even more intrusive and drastic medical treatment is proposed and the capacity of the involuntary patient to consent to or refuse ECT is at issue.

■ We thus conclude subdivision (f) of section 5326.7 clearly provides the court must conduct an evidentiary hearing at which the patient shall be present before the court may make the ultimate decision the patient does or does not have the capacity to give written informed consent to ECT. Only with such opportunity to observe and question the patient will the integrity of the court's factfinding process satisfy the patient's due process right " 'to be heard at a meaningful time and in a meaningful manner' " before the patient's right to refuse ECT is removed. (*Edward W., supra,* 99 Cal.App.4th at p. 532.)

In this case, the court did not require the patient's presence. Rather it refused Pamela's counsel's requests the court either grant a continuance to obtain her presence or go to the location where she was detained to conduct the hearing as in many other LPS proceedings to determine capacity.[7] The court accepted without authority Kushnir's oral declaration Pamela had refused to come to court even though she knew about the hearing as a waiver of her presence. We find it somewhat incongruous that the court found Pamela capable of knowingly and intelligently waiving her presence at the hearing to determine her capacity to consent to ECT and at the same time found she did not have the capacity to knowingly and intelligently consent to or refuse ECT.

---

[7] Although we acknowledge that requiring an LPS patient's presence at such hearings creates some logistical problems where the patient refuses to come to court, as in Pamela's case, and the court has to go to the patient's facility to satisfy such requirement, we presume the Legislature considered such inconveniences and costs when it added the requirement that a patient be present at the ECT capacity hearing in order to protect his or her right to refuse ECT without a determination of incapacity. (See *Edward W., supra,* 99 Cal.App.4th at pp. 543–544.)

■ Because we have concluded Pamela's presence was an essential ingredient to the court's factfinding process of determining whether she had the capacity to consent to or refuse ECT under section 5326.7, subdivision (f), the court erred in proceeding in her absence and doing so essentially compromised its decision. As the evidence at the hearing in Pamela's absence showed she may have had some capacity to provide informed consent, with both her counsel's comments and Kushnir's testimony agreeing she knew she had had ECT before, how it affected her, and she was possibly agreeable to three such treatments, we cannot say the court's proceeding to determine the issue of her capacity to consent to ECT without her being present was harmless beyond a reasonable doubt (*Conservatorship of McKeown* (1994) 25 Cal.App.4th 502, 507 [30 Cal.Rptr.2d 542]), or that it did not violate her constitutional guarantee of due process (see *Edward W., supra*, 99 Cal.App.4th at p. 545). Accordingly, we reverse the court's January 13, 2005 order finding Pamela did not have the capacity to give written informed consent to ECT.

Having decided the matter must be reversed, we need not consider Pamela's contention there is no substantial evidence to support the court's conclusion by clear and convincing evidence she did not have the capacity to consent. However, because she also raises an important issue about the court's authority to question witnesses during the ECT evidentiary hearing, we briefly address that argument.

C. *The Court's Questioning*

Relying on several juvenile law dependency cases (e.g., *Gloria M. v. Superior Court* (1971) 21 Cal.App.3d 525, 528 [98 Cal.Rptr. 604]; *Lois R. v. Superior Court* (1971) 19 Cal.App.3d 895, 897–898 [97 Cal.Rptr. 158]) and a delinquency case (*In re Ruth H.* (1972) 26 Cal.App.3d 77, 84–86 [102 Cal.Rptr. 534]), Pamela contends the trial court violated her due process rights to a fair hearing by an impartial judge by acting in the dual capacity as judge and advocate, thus creating the appearance of partiality which negated any appearance of justice during the section 5326.7, subdivision (f) evidentiary hearing. We find no merit in Pamela's assertion.

All the cases Pamela relies upon predate *People v. Carlucci* (1979) 23 Cal.3d 249 [152 Cal.Rptr. 439, 590 P.2d 15] (*Carlucci*), which she acknowledges held that a judge has the power to examine witnesses to assist in ascertaining the truth. She argues, however, that *Carlucci* only pertained to traffic infractions and not fundamental rights as in this case and those upon which she relies, and that the power to question witnesses does not extend to what happened in this case because the court crossed the line by calling Kushnir as a witness, asking him 29 leading questions and overruling her

counsel's objections to questions which involved matters not relevant to a capacity hearing. We disagree.

Evidence Code section 775 specifically provides that "[t]he court, on its own motion or on the motion of any party, may call witnesses and interrogate them the same as if they had been produced by a party to the action, and the parties may object to the questions asked and the evidence adduced the same as if such witnesses were called and examined by an adverse party. Such witnesses may be cross-examined by all parties to the action in such order as the court directs."

■ From this authority which "merely codifies traditional case law," "[n]umerous courts . . . have recognized that it is not merely the right but the duty of a trial judge to see that the evidence is fully developed before the trier of fact and to assure that ambiguities and conflicts in the evidence are resolved insofar as possible. [Citation.]" (*Carlucci, supra*, 23 Cal.3d at p. 255.) " '[I]t has been repeatedly held that if a judge desires to be further informed on certain points mentioned in the testimony it is entirely proper for him to ask proper questions for the purpose of developing all the facts in regard to them. Considerable latitude is allowed the judge in this respect as long as a fair trial is indicated [to both parties]. Courts are established to discover where lies the truth when issues are contested, and the final responsibility to see that justice is done rests with the judge.' " (*Ibid.*, quoting *People v. Lancellotti* (1957) 147 Cal.App.2d 723, 730 [305 P.2d 926].)

■ The authority of the trial judge to question witnesses not only applies to cases tried to a jury but also to the court sitting as the fact finder. (*Carlucci, supra*, 23 Cal.3d at pp. 255–256.) "It apparently cannot be repeated too often for the guidance of a part of the legal profession that a judge is not a mere umpire presiding over a contest of wits between professional opponents, but a judicial officer entrusted with the grave task of determining where justice lies under the law and the facts between the parties who have sought the protection of our courts. Within reasonable limits, it is not only the right but the duty of a trial judge to clearly bring out the facts so that the important functions of his office may be fairly and justly performed. [Citations.]" (*Estate of Dupont* (1943) 60 Cal.App.2d 276, 290 [140 P.2d 866].) This is especially true of the judge at a hearing to determine the capacity of a patient to consent to ECT under the LPS.

■ Although the conservator or a responsible person may be present at the evidentiary ECT capacity hearing, it generally includes only the court, the patient/conservatee, his or her counsel and the petitioner, which is either the patient's physician or counsel and who has opined the patient does not have the capacity to consent to or refuse ECT under the Act. (§ 5326.7, subd. (f).)

If the petitioner is the patient's counsel, then the patient will be represented at the hearing by an unconflicted counsel. (§ 5326.7, subd. (f).) Because the court's sole purpose at the hearing is to ascertain the patient's mental capacity to understand about ECT and knowingly and intelligently consent to or refuse such treatment, it is only logical that a judge would call and question the petitioner, be it the patient's treating physician or counsel, the patient and any other witness, who could provide evidence on the issue of the patient's mental competence to give consent. An examination of such witnesses would aid the court in seeking the truth of the allegation of incompetency to consent in the petition, in preventing misunderstanding, in clarifying the allegation or any omission in the petition, in allowing the witness his or her right of explanation, and in general eliciting facts relevant to the best possible determination of the matter. (*Carlucci, supra,* 23 Cal.3d at p. 256.)

Such questioning by the court, which aids in a "simplified and expeditious" resolution of a capacity hearing unconstrained by the more stringent procedural requirements of a major civil trial, or even the trial that may be elected for the establishment or reestablishment of an LPS conservatorship, benefits the interests of the patient as well as medical professionals, court and public. (See *Carlucci, supra,* 23 Cal.3d at pp. 256–258.)

Here, it appears to us the trial court's participation in the calling and examining of both Kushnir and Pamela's counsel merely involved questions seeking to clarify Pamela's capacity to consent to the use of ECT on her by Kushnir. Although several of the questions may have gone beyond Kushnir explaining why he opined ECT was needed to treat Pamela and her prognosis should she not receive ECT, which were proper to consider in assessing her ability to consent to the therapy (*Fadley, supra,* 159 Cal.App.3d 440), Pamela has not specifically raised evidentiary errors regarding such questions on appeal. Rather Pamela only argues the fact the court overruled her counsel's objections to questions which might have been irrelevant to the capacity determination showed the court was somehow partial to Kushnir and biased against her. We have thoroughly reviewed the transcript of the evidentiary hearing and are satisfied that the court's involvement was "consistent with what should be expected of any reasonable, conscientious judge in a similar situation." (*Carlucci, supra,* 23 Cal.3d at p. 259.) Even if several of the court's questions were irrelevant, such did not show any partiality or bias. As Pamela concedes, many of the direct questions merely tracked the statutory requirements necessary for obtaining consent to ECT which were enacted to protect the rights of LPS patients like herself. Under these circumstances, we conclude the court's conducting of the evidentiary hearing by personally questioning the witnesses in such manner did not violate Pamela's due process right to a fair and impartial hearing on her capacity to consent to ECT.

## DISPOSITION

The order appealed from is reversed.

Nares, J., and Irion, J., concurred.