[No. G046468. Fourth Dist., Div. Three. Mar. 14, 2012.]

SCOTT S., an Incompetent Person, etc., Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
LUCILLE LYON, as Public Guardian, etc., Real Party in Interest.

Counsel

Frank Ospino, Public Defender, Mark Brown and Kira Rubin, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Nicholas S. Chrisos, County Counsel, and James C. Harvey, Deputy County Counsel, for Real Party in Interest.

Opinion

**IKOLA, J.**—Petitioner Scott S. petitions for writ review of an order authorizing Lucille Lyon, public guardian for Orange County, to consent to amputating petitioner's infected toe. He contends the court erred by relying on a physician's written declaration to find the amputation was medically necessary.

We agree. The Lanterman-Petris-Short Act (LPS; Welf. & Inst. Code, § 5000 et seq.)[1] authorizes conservatorships for gravely disabled persons like petitioner. The conservatee generally retains the right to give or withhold consent to medical treatment. The conservator must seek authorization from the court to obtain medical treatment to which the conservatee objects. (§ 5358.2.)

Resolving an issue of first impression, we hold an LPS conservator seeking such an order must show the desired treatment is medically necessary—and must do so through admissible evidence. This conclusion follows from plain statutory language and harmonizes the LPS with the Probate Code, portions of which the LPS incorporates by reference. We grant the writ petition and direct the court to vacate its order and conduct a new hearing to determine whether admissible evidence shows the amputation is medically necessary.

FACTS

Petitioner is subject to an LPS conservatorship. The letters of conservatorship appoint the Orange County Public Guardian as the conservator, and grant to the public guardian the right to require petitioner to receive medical treatment related to the recurrence of his grave disability or four specified medical conditions. But the letters withhold any general authority for the public guardian to consent to medical treatment for petitioner. To the contrary, they provide: "Except in the case of an emergency in which

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[petitioner] faces loss of life or serious bodily injury, no surgery shall be performed upon [petitioner] without the [petitioner's] prior consent or court order."

The public guardian applied to the court for an order pursuant to section 5358.2 authorizing her to consent on petitioner's behalf to the amputation of the second toe on his right foot. She filed a form declaration from petitioner's physicians.

In the declaration, one physician stated petitioner suffered from "osteomyelitis, open wound of the right second toe." He explained the benefit of amputation would be to "eliminate ongoing source of infection," while the risks include "breakdown of the wound, possible need for further amputation." Without amputation, petitioner would face "progressive destruction of the toe, possible ascending infection to the foot." With amputation, petitioner's prognosis would be "good," with "minimal impact on [his] ability to walk."

A second physician stated on the declaration that petitioner "[l]acks the capacity to give informed consent to the proposed medical treatment . . . ." This physician explained petitioner suffers from "schizoaffective disorder" and *"major impairment"* to his information processing ability—several functions were *"so impaired as to be incapable of being assessed."*

At the hearing, petitioner contended the public guardian could not show the amputation was medically necessary because the declaration was hearsay. The public guardian conceded the declaration was inadmissible hearsay. But the public guardian asserted petitioner's capacity to consent to medical treatment was "the only issue in a proceeding brought under Welfare and Institutions Code [section] 5358.2," and "medical necessity is not a required element of proof under that statute."

After thorough discussion and deliberation,[2] the court concluded "capacity is the sole issue for this hearing." It stated the declaration was "sufficient" and provided "enough information that I could—I could opine that it's medically necessary," later reiterating amputation was "medically necessary, based upon this document . . . ." It acknowledged petitioner's hearsay objection, yet noted that "[w]hat the court thinks about having a doctor here" to testify "is really not the issue." "But, based upon what I've researched and reviewed," the court stated, "I believe that the law does prescribe that the sole issue to be decided at this particular proceeding is the issue of [petitioner's] capacity to give or withhold informed consent . . . ."

---

[2] The hearing transpired over three days. The court considered written briefs and extensive argument from petitioner and the public guardian, and conducted its own legal research.

The court proceeded to conduct a hearing on petitioner's capacity to consent to medical treatment. The public guardian called James Earnest as a witness. The court began to ask counsel to "stipulate that Dr. Earnest is qualified as a forensic psychiatrist," but petitioner's counsel interrupted to refuse to stipulate to the witness's competence "to give testimony on the medical capacity of the need for these procedures." The court clarified the issue is "whether or not [petitioner] can consent or withhold consent, or consent to the performance of the procedure. And, I mean, the issue was framed as a psychiatrist but it would be [a] psychologist."

Dr. Earnest testified he had examined petitioner and his medical records and concluded petitioner suffers from "schizophrenic disorder." He opined petitioner "lacks capacity to make decisions regarding this present medical procedure," in "that he wasn't able to engage with me in any kind of meaningful discussion or risks and benefits, even of understanding the nature of his disorder, and was unable to give me a reason for objecting to the procedure that went beyond the simple refusal." Petitioner objected on the ground of lack of foundation and moved to strike the witness's entire testimony—the court overruled the objection and denied the motion.

The public guardian also called petitioner as a witness. Petitioner testified: "I don't know why I'm here. I know why I'm here, but, you know why I'm here." He also stated: "I don't think I need to be here today, not me." When asked whether he was "objecting to having the medical procedures done today," petitioner answered, "No." Over the public guardian's objection, petitioner's counsel spoke to him off the record while he remained on the stand. His counsel then asked him on the record, "Do you want to have your toe amputated?" Petitioner answered, "No."

The public guardian then asked petitioner in several different ways whether he knew why his doctors recommended amputating his toe. Petitioner's answers included: "Well, it's not going to be removed. It will be fixed, not removed, and you guys will pay for it"; "No, you can't talk to me. The case—[unintelligible]—the doctor never told me because I—who else? Huh?"; "That I—same thing, they'd have—amputate my leg"; "I can't go on"; "They are not going to amputate my . . . toe"; "There's not enough doctors in that place"; and "I could care less about your problems." After that, the court found "the questions are just not going to generate responsive answers."

After hearing argument, the court found petitioner "lacks the capacity to give or withhold informed consent" to amputating his toe. It found Dr. Earnest had foundation to testify about petitioner's psychological disorder and his ability to give informed consent. It noted petitioner's "testimony in court was probably supportive of what Dr. Earnest may have come across during his

interview of [petitioner], that some of the responses were not exactly in tune with the questions that were presented to him." The court granted authority to the public guardian to consent to the amputation on petitioner's behalf. But it stayed its order pending review.

Petitioner filed this petition for an extraordinary writ and, at our invitation, the public guardian filed an informal response. We stayed the proceedings and notified the parties we were "considering issuing a peremptory writ of mandate in the first instance" and solicited additional briefing from the public guardian. The public guardian responded with a letter denying the propriety of *"Palma* relief" *(Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 179 [203 Cal.Rptr. 626, 681 P.2d 893]), but opting to "not significantly supplement its substantive challenge to the writ petition."[3]

## DISCUSSION

Petitioner contends the court erred by relying on a written declaration to determine the amputation was medically necessary. He further contends the court erred by relying on Dr. Earnest's testimony to determine his capacity to consent, and not requiring testimony from the treating physician.

The public guardian responds that the court need not determine medical necessity at all—the only issue here is petitioner's capacity to consent. And on that point, the public guardian contends Dr. Earnest's testimony sufficiently supports the order.

*The LPS*

■ "The rights of involuntarily detained mentally disordered people in California are scrupulously protected by the [LPS]. [Citations.] The act repealed the previously existing indeterminate civil commitment scheme;

---

[3] Issuing a peremptory writ in the first instance is appropriate here. First, the procedural safeguards have been met. We notified the public guardian " 'that the issuance of such a writ in the first instance is being sought or considered.' " *(Brown, Winfield & Canzoneri, Inc. v. Superior Court* (2010) 47 Cal.4th 1233, 1241 [104 Cal.Rptr.3d 145, 223 P.3d 15].) We have " 'received, or solicited, opposition from' " the public guardian. *(Ibid.)* And " 'it appears that the petition and opposing papers on file adequately address the issues raised by the petition, that no factual dispute exists, and that the additional briefing that would follow issuance of an alternative writ is unnecessary to disposition of the petition.' " *(Ibid.)* Second, " 'there is an unusual urgency requiring acceleration of the normal process.' " *(Id.* at p. 1242.) According to the public guardian, petitioner is suffering from a spreading infection that, if not halted now, may require amputating his foot. Thus, the public guardian can hardly dispute the urgency here. Indeed, the public guardian concedes "petitioner's medical issues present a greater degree of urgency than the typical writ before this Court." We thus issue this writ forthwith, "without affording the parties an opportunity for oral argument." *(Brown, Winfield, & Canzoneri,* at p. 1243.)

removed legal disabilities previously imposed upon those adjudicated to be mentally ill; and emphasized voluntary treatment, with periods of involuntary observation and crisis treatment for people unable to care for themselves or whose condition makes them a danger to themselves or others." (*Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1312–1313 [271 Cal.Rptr. 199] (*Riese*).)

The LPS "governs the involuntary detention, evaluation, and treatment of persons who, as a result of mental disorder, are dangerous or gravely disabled. [Citation.] The Act authorizes the superior court to appoint a conservator of the person for one who is determined to be gravely disabled [citation], so that he or she may receive individualized treatment, supervision, and placement [citation]. As defined by the Act, a person is 'gravely disabled' if, as a result of a mental disorder, the person 'is unable to provide for his or her basic personal needs for food, clothing, or shelter.' " (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 142 [105 Cal.Rptr.3d 424, 225 P.3d 554] (*John L.*).)

With specified exceptions, "[t]he procedure for establishing, administering, and terminating a conservatorship under [the LPS] shall be the same as that provided in Division 4 (commencing with Section 1400) of the Probate Code . . . ."[4] (§ 5350.) "Section 5350 . . . mandates that LPS conservatorships shall be established pursuant to the procedure set forth in the Probate Code, subject to certain listed exceptions." (*John L., supra*, 48 Cal.4th at p. 144.)

"In a nutshell, the LPS 'is intended to provide prompt, short-term, community-based intensive treatment, without stigma or loss of liberty, to individuals with mental disorders who are either dangerous or gravely disabled. [Citation.]' [Citation.] The [LPS] Act ' "represents a delicate balance 'between the medical objectives of treating sick people without legal delays and the equally valid legal aim of insuring that persons are not deprived of their liberties without due process of law.' " ' " (*Conservatorship of Pamela J.* (2005) 133 Cal.App.4th 807, 819–820 [35 Cal.Rptr.3d 228].)

---

[4] The Probate Code sets forth "a separate statutory scheme governing the appointment of conservators of the person for 'adults who for any reason are incapable of taking care of themselves.' " (*John L., supra*, 48 Cal.4th at p. 144.) "Unlike an LPS conservatorship, a probate conservatorship does not depend on a showing of grave disability resulting from a mental disorder, and involuntary commitment is not contemplated. [Citation.] While LPS conservatorship proceedings may be initiated only by the agency-designated conservatorship investigator [citation], the proposed conservatee, spouse, domestic partner, relative, or other 'interested' agency, person, or friend has standing to file a petition for a probate conservatorship [citation]. Finally, the court need not appoint counsel in all proceedings to establish a probate conservatorship because, unlike the situation in LPS conservatorships, there is no risk of involuntary commitment." (*Ibid.*)

■ Importantly, "[a]ppointment of a conservator under LPS, as under the Probate Code, does not involve an adjudication of incompetence . . . ." (*Riese, supra,* 209 Cal.App.3d at p. 1313.) "It is one of the cardinal principles of LPS that mental patients may not be presumed incompetent solely because of their hospitalization." (*Id.* at p. 1315.) "No person may be presumed to be incompetent because he or she has been evaluated or treated for mental disorder . . . , regardless of whether such evaluation or treatment was voluntarily or involuntarily received." (§ 5331.)

■ And the conservatee "retain[s] all rights not specifically denied under the LPS." (*Edward W. v. Lamkins* (2002) 99 Cal.App.4th 516, 526 [122 Cal.Rptr.2d 1] (*Edward W.*).) "Unless specifically stated, a person [detained under] the provisions of this part shall not forfeit any legal right or suffer legal disability by reason of the provisions of this part." (§ 5005.) "Persons with mental illness have the same legal rights and responsibilities guaranteed all other persons by the Federal Constitution and laws and the Constitution and laws of the State of California, unless specifically limited by federal or state law or regulations." (§ 5325.1.) "Every person involuntarily detained . . . shall be entitled to all rights set forth in this part and shall retain all rights not specifically denied him . . . ." (§ 5327.)

■ Thus, "[a] conservatee retains the right to refuse or consent to treatment related specifically to his or her being gravely disabled, and to *routine medical treatment, unless the court specifically orders to the contrary.*" (*Edward W., supra,* 99 Cal.App.4th at p. 534.) "[T]he right of persons not adjudicated incompetent to give or withhold consent to medical treatment is protected by the common law of this state [citations] and by the constitutional right to privacy." (*Riese, supra,* 209 Cal.App.3d at p. 1317.) "Our Legislature has made it very clear that the patient's right to agree to or refuse a recommended treatment does not vanish even when the patient is involuntarily committed." (*Conservatorship of Pamela J., supra,* 133 Cal.App.4th at p. 820.)

■ In the initial appointment, the court may authorize the LPS conservator to consent on the conservatee's behalf to *routine* medical treatment. "A conservator shall also have the right, if specified in the court order, . . . to require his or her conservatee to receive routine medical treatment unrelated to remedying or preventing the recurrence of the conservatee's being gravely disabled." (§ 5358, subd. (b).) But even so, that authorization does not extend to nonroutine medical treatment like surgery. "Except in emergency cases in which the conservatee faces loss of life or serious bodily injury, no surgery shall be performed upon the conservatee without the conservatee's prior consent or a court order obtained pursuant to Section 5358.2 specifically authorizing that surgery." (§ 5358, subd. (b).)

As this statute indicates, an LPS conservator may seek court authorization to consent to nonroutine medical treatment for the conservatee pursuant to section 5358.2. "If a conservatee requires medical treatment and the conservator has not been specifically authorized by the court to require the conservatee to receive medical treatment, the conservator shall, after notice to the conservatee, obtain a court order for that medical treatment, except in emergency cases in which the conservatee faces loss of life or serious bodily injury. The conservatee, if he or she chooses to contest the request for a court order, may petition the court for hearing which shall be held prior to granting the order."[5] (§ 5358.2.)

Neither party disputes the public guardian needs a court order pursuant to section 5358.2 before authorizing amputation of petitioner's toe. What remains are two questions: What must the public guardian show to obtain court authorization to consent to the amputation on petitioner's behalf? And what kind of evidence must the public guardian offer in making that showing?

*The Court Must Find Medical Necessity Before Authorizing an LPS Conservator to Consent for the Conservatee to Nonroutine, Nonemergency Medical Treatment*

The first question concerns the elements of proof. Below, the parties agreed the public guardian must show at least that petitioner lacks the capacity to make his own medical decisions. (See, e.g., §§ 5005, 5327, 5331 [retained rights].) The public guardian contends that is the only relevant factor. But petitioner asserts the public guardian must also show the proposed amputation is medically necessary, though he cites no case law so holding. Our own research reveals no cases squarely on point.[6]

But section 5358.2's plain language obligates a conservator to show the proposed treatment is medically necessary. It uses the word "requires"— "If a conservatee requires medical treatment . . . ." (*Ibid.*) Contrast this phrase with other phrases the Legislature could have used in the LPS. The statute does not start "If a conservatee might benefit from medical treatment" or "If a conservator desires medical treatment for the conservatee" or "If a conservator has a good faith basis for obtaining medical treatment for the conservatee." Instead, section 5358.2 allows the court to authorize the conservator to

---

[5] The public guardian has not invoked the emergency exception for "cases in which the conservatee faces loss of life or serious bodily injury." (§§ 5358, subd. (b), 5358.2.) We do not reach whether it applies here, or what procedures the exception entails.

[6] One practice guide weighs in with an unsupported "PRACTICE TIP." (2 Cal. Conservatorship Practice (Cont.Ed.Bar 2011) § 23.114, p. 1402.) It makes the bald assertion: "The issue at [the section 5358.2] hearing should be strictly the capacity of the conservatee to consent to (or refuse) the proposed treatment." (*Ibid.*) We disagree for the reasons explained herein.

consent to medical treatment for the conservatee only if the conservatee "requires medical treatment . . . ." (*Ibid.*) Required medical treatment is treatment that is medically necessary.

■ Even if section 5358.2 was not expressly limited to medically necessary treatment, Probate Code section 2357 would fill in the gap. The LPS adopts the Probate Code's "procedure for . . . administering . . . a conservatorship" where the LPS is silent. (§ 5350.) Courts regularly turn to the Probate Code when construing the LPS. (See, e.g., *John L., supra,* 48 Cal.4th at p. 144; *Edward W., supra,* 99 Cal.App.4th at p. 541 [Prob. Code notice requirement applies to LPS conservatorships].) And the Probate Code provides: "If the . . . conservatee requires medical treatment for an existing or continuing medical condition which is not authorized to be performed upon the . . . conservatee . . . and the . . . conservatee is unable to give an informed consent to this medical treatment, the . . . conservator may petition the court under this section for an order authorizing the medical treatment and authorizing the . . . conservator to consent on behalf of the . . . conservatee to the medical treatment." (Prob. Code, § 2357, subd. (b).)

■ But the Probate Code goes on to require that treatment be medically necessary. The court must first find: "(1) The existing or continuing medical condition of the ward or conservatee requires the recommended course of medical treatment. [¶] (2) If untreated, there is a probability that the condition will become life-endangering or result in a serious threat to the physical or mental health of the ward or conservatee. [¶] (3) The ward or conservatee is unable to give an informed consent to the recommended course of treatment." (Prob. Code, § 2357, subd. (h).)

■ An LPS conservator seeking authorization pursuant to section 5358.2 should make a similar showing of medical necessity. We hold the conservator must show the conservatee's medical condition "requires the recommended course of medical treatment" (Prob. Code, § 2357, subd. (h)(1)) and "a probability [exists] that the condition will become life-endangering or result in a serious threat to the [conservatee's] physical or mental health . . ." without the treatment (*id.*, subd. (h)(2)).[7] A treatment is medically necessary only if the conservator satisfies both requirements. Of course, before granting the conservator's application the court must also find the conservatee lacks

---

[7] One case flagged—but left unresolved—the issue of whether Probate Code section 2357 applies to applications for orders pursuant to Welfare and Institutions Code section 5358.2. In *Maxon v. Superior Court* (1982) 135 Cal.App.3d 626 [185 Cal.Rptr. 516], a public guardian sought an order for authority to consent to a hysterectomy for an LPS conservatee suffering from cervical cancer. (*Maxon,* at p. 628.) The court contrasted Welfare and Institutions Code section 5358.2 with the "[s]imilar, but more comprehensive, provisions" of Probate Code section 2357. (*Maxon,* at p. 629, fn. 2.) But it noted the public guardian "proceeded under

the capacity to give or withhold informed consent to the treatment. (Prob. Code, § 2357, subd. (h)(3); see also Welf. & Inst. Code, §§ 5005, 5327, 5331.)

■ This conclusion harmonizes the LPS with Probate Code section 2357, which "serves the same purpose as Section 5358.2." (Cal. Law Revision Com. com., 52A West's Ann. Prob. Code (2002 ed.) foll. § 2357, p. 407.) " '[S]tatutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.' " (*Ortiz v. Lyon Management Group, Inc.* (2007) 157 Cal.App.4th 604, 613 [69 Cal.Rptr.3d 66].) These statutes are readily harmonized, contrary to the doubts of the public guardian and the trial court. Welfare and Institutions Code section 5358.2 directs the LPS conservator to apply for an order, but does not specify the requirements for obtaining that order, let alone any requirements that conflict with Probate Code section 2357. The statutes are best harmonized by reading Probate Code section 2357 as setting forth the procedural and substantive requirements for obtaining the order mandated by section 5358.2.[8]

No persuasive authority excuses an LPS conservator from showing the desired treatment is medically necessary. In contending the only issue under section 5358.2 is the conservatee's capacity to consent, the public guardian relies upon two lines of cases: the electroconvulsive therapy (ECT) cases and the antipsychotic drug cases. But those cases are limited in scope.

---

Probate Code section 2357 and the court made factual findings under its provisions. Consequently, we need not now decide whether the more protective procedures contained in that section are supplemental to those set forth in . . . section 5358.2." (*Maxon*, at p. 629, fn. 2.)

[8] On the other hand, the LPS cannot be harmonized with Probate Code section 2355. (See Welf. & Inst. Code, § 5350, subd. (h) [Prob. Code governs LPS conservatorships unless LPS provides otherwise].) Probate Code section 2355 allows the court to initially authorize a probate conservator to make all medical decisions for the conservatee, including end-of-life decisions. (*Conservatorship of Drabick* (1988) 200 Cal.App.3d 185, 200–201 [245 Cal.Rptr. 840].) The LPS expressly forbids the court from making a similarly broad grant of authority at the inception of an LPS conservatorship. (§ 5358, subd. (b) [court may authorize LPS conservator in advance to consent only to routine medical treatment].) A similar incongruity 30 years ago between the LPS and then recently amended statutes governing probate conservatorships and guardianships presumably led the Attorney General to opine "the specific and detailed procedures set forth in . . . sections 5357, 5358 and 5358.2 constitute the exclusive means by which the [LPS] conservator is given the power to make necessary medical decisions for the conservatee." (60 Ops.Cal.Atty.Gen. 375 (1977).) The Attorney General wanted to dispel any notion "that the Legislature intended that the *specific and detailed* procedures [of the LPS], designed to protect a fundamental right, could be avoided by a *general* finding of 'incompetence' at the inception of the proceedings." (*Id.* at p. 378.) We avoid that misguided result by concluding Welfare and Institutions Code section 5358.2 may be read together with Probate Code section 2357, but not with Probate Code section 2355.

The public guardian's first line of cases applies section 5326.7, which on its face authorizes ECT only when medically necessary. (See *Lillian F. v. Superior Court* (1984) 160 Cal.App.3d 314, 317 [206 Cal.Rptr. 603]; *Conservatorship of Fadley* (1984) 159 Cal.App.3d 440, 446 [205 Cal.Rptr. 572]; *Conservatorship of Waltz* (1986) 180 Cal.App.3d 722, 732 [227 Cal.Rptr. 436].) Section 5326.7 requires the treating physician to first conclude ECT "is definitely indicated and is the least drastic alternative available for" the patient. (§ 5326.7, subd. (a).) Next, this conclusion must be unanimously endorsed by two board-certified or board-eligible psychiatrists or neurologists. (*Id.*, subd. (b).) Only then may the patient be asked to consent to ECT. (*Id.*, subd. (d).) Or, if the patient's physician or attorney question his or her capacity to consent, the court must ascertain the patient's capacity. (*Id.*, subd. (f).) Thus, medical necessity for ECT must be shown before the issue of the patient's capacity to consent even arises.

These three ECT cases expressly limit their analysis to section 5326.7. And because section 5326.7 applies only after three physicians have recommended ECT, the cases honed in on whether the conservatee had the capacity to consent. (See, e.g., *Lillian F. v. Superior Court, supra*, 160 Cal.App.3d at p. 317 ["we hold that the standard of proof applicable to a section 5326.7, subdivision (f), proceeding is that of proof of the conservatee's lack of capacity to consent by clear and convincing evidence"].) That explains why one of the cases held "the issue before the court at a subdivision (f) evidentiary hearing . . . is a narrow one: Does the patient have the ability to give written consent to the proposed therapy. Not at issue in the hearing is whether ECT is definitely indicated and the least drastic alternative available to the patient. The Legislature has, pursuant to section 5326.7, subdivisions (a) and (b), left this determination to the treating physician and review thereof to a two-physician review committee, because it is 'a purely medical determination, which is within a doctor's professional judgment.' " (*Conservatorship of Fadley, supra*, 159 Cal.App.3d at p. 446.) A later case reiterated: "The issue before the trial court is a narrow one: Is the patient able to give informed consent? The issue is not whether ECT is definitely needed, or is the least drastic alternative available; these are purely medical determinations." (*Conservatorship of Waltz, supra*, 180 Cal.App.3d at p. 728.) Of course the issue is narrow pursuant to section 5326.7—that statute provides its own procedure for determining when ECT is medically necessary. These cases offer no broader guidance applicable to section 5358.2.

The second line of distinguishable cases involves treatment for the conservatee's gravely disabling condition. In one case, the court held only that "state prisoners, like nonprisoners under the LPS statutory scheme, are entitled to a judicial determination of their competency to refuse treatment before they can be subjected to long-term involuntary psychotropic medication." (*Keyhea v. Rushen* (1986) 178 Cal.App.3d 526, 542 [223 Cal.Rptr.

746].) There seemed to be no dispute the prisoners were suffering from serious mental disorders, and no challenge to the prison's multistep procedure (*id.* at p. 531) for determining antipsychotic drugs were medically necessary. In another case, the court unsurprisingly held LPS conservatees "have statutory rights to exercise informed consent to the use of antipsychotic drugs in nonemergency situations absent a judicial determination of their incapacity to make treatment decisions." (*Riese, supra*, 209 Cal.App.3d at p. 1308.) Without recognizing the limited reach of the ECT cases, the *Riese* court relied upon them in asserting it had to provide only "an evidentiary hearing directed to the question whether the patient is able to understand and knowingly and intelligently act upon information required to be given regarding the treatment. [Citations.] . . . The court is *not* to decide such medical questions as whether the proposed therapy is definitely needed or is the least drastic alternative available, but may consider such issues only as pertinent to assessment of the patient's ability to consent to the treatment." (*Id.* at p. 1322.) In the final case, the court held mentally disordered offenders (see Pen. Code, § 2962 et seq.) have the same right as LPS conservatees to refuse to consent to antipsychotic medication. (*In re Qawi* (2004) 32 Cal.4th 1, 24–25 [7 Cal.Rptr.3d 780, 81 P.3d 224].)

The antipsychotic drug cases are unhelpful here. They address only the treatment of a mental disorder already shown either to be gravely disabling (as with the LPS conservatee in *Riese*; see § 5350) or to create a substantial danger of physical harm to others (as with the mentally disordered offender in *In re Qawi*; see Pen. Code, § 2962, subd. (d)(1)). Medical necessity for the antipsychotic medication has thus been established (or, for the prisoners in *Keyhea v. Rushen, supra*, 178 Cal.App.3d 526, apparently presumed). And so *Riese* could understandably look to the ECT cases when holding its only role was to determine the conservatee's capacity to consent. (*Riese, supra*, 209 Cal.App.3d at p. 1322.) But we cannot.

The exclusive focus in the ECT and antipsychotic drug cases on the capacity to consent applies only to similar cases where medical necessity has already been shown. None of these cases even purports to define the relevant factors for issuing an order pursuant to section 5358.2. *Riese*, for example, does not apply section 5358.2 at all. It mentions the statute only twice, in passing. (*Riese, supra*, 209 Cal.App.3d at pp. 1320, 1325.)

In sum: Before the court authorizes an LPS conservator pursuant to section 5358.2 to consent for the conservatee to nonroutine, nonemergency medical treatment, it must find (1) the conservatee lacks the capacity to give or withhold informed consent, and (2) the treatment is medically necessary—

i.e., (a) the conservatee has a medical condition that requires the recommended treatment, and (b) without treatment, a probability exists the condition will endanger the conservatee's life or seriously threaten his or her physical or mental health.

*The Court Must Find Medical Necessity Based on Admissible Evidence*

 This raises our second question: What kind of evidence must the public guardian offer in showing the amputation is medically necessary? The answer is straightforward: admissible evidence. The Evidence Code "applies in every action before the Supreme Court or a court of appeal or superior court," unless "otherwise provided by statute." (Evid. Code, § 300.) Nothing in the LPS provides otherwise.

 The declaration upon which the court relied was inadmissible. "Except as provided by law, hearsay evidence is inadmissible." (Evid. Code, § 1200, subd. (b).) And the declaration is classic hearsay. "Any statement not made by a witness testifying in court before the fact finder constitutes hearsay evidence when offered for its truth. [Citation.] Largely because the declarant is absent and unavailable for cross-examination under oath, hearsay evidence is less reliable than live testimony. [Citations.] Hearsay evidence is generally incompetent and inadmissible without statutory or decisional authorization, or absent stipulation or waiver by the parties."[9] (*Kulshrestha v. First Union Commercial Corp.* (2004) 33 Cal.4th 601, 608–609 [15 Cal.Rptr.3d 793, 93 P.3d 386].) "The proponent of hearsay has to alert the court to the exception relied upon and has the burden of laying the proper foundation." (*People v. Livaditis* (1992) 2 Cal.4th 759, 778 [9 Cal.Rptr.2d 72, 831 P.2d 297].) Petitioner objected below to the declaration repeatedly, yet the public guardian cites no hearsay exception covering the declaration. To the contrary, the public guardian told the court, "we're not suggesting that the court should consider the declaration of the doctor over the hearsay objection." The court should have excluded it.[10]

Admission of the declaration was prejudicial. No other evidence was offered to show amputation was medically necessary. And as petitioner noted

---

[9] Here again the Probate Code is instructive. When a probate conservator seeks authority to consent to medical treatment for the conservatee, "the matter may be submitted for the determination of the court upon proper and sufficient medical affidavits or declarations if the attorney for the petitioner and the attorney for the . . . conservatee so stipulate and further stipulate that there remains no issue of fact to be determined." (Prob. Code, § 2357, subd. (g).) There was no such stipulation here.

[10] We express no opinion on what kind of evidence is required, other than admissible evidence. In particular, we do not hold the LPS conservator must in every case call the treating physician to testify about medical necessity, if other relevant evidence on that point is admissible.

below, without cross-examination of the declaring physicians "[w]e won't be able to talk about what the alternatives are to amputation, what the doctor's findings were in terms of, has he had that additional antibiotic treatment, has he been given intravenous [anti]biotics, you know, exactly what has been the course of treatment in order to remediate his infection, prior to getting to the point where we're talking about taking off his toe because the declaration itself is silent on all of those questions." A reasonable probability exists petitioner would have obtained a different result had the court excluded the declaration. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

*The Psychologist's Testimony Sufficiently Supported the Lack-of-capacity Finding*

Petitioner challenges the foundation for Dr. Earnest's opinion, upon which the court relied in finding petitioner lacked the capacity to give or withhold informed consent to medical treatment. First, petitioner notes Dr. Earnest did not testify about his education, experience, or other expert credentials. Second, petitioner contends only the treating physician can testify about his capacity to consent. He asserts the treating physician is the only person with personal knowledge of the discussion at which he or she disclosed the benefits and risks of the amputation. Neither contention has merit.

First, Dr. Earnest's expert qualifications were essentially conceded below. (See Evid. Code, § 720, subd. (a) [expert must show credentials only "[a]gainst the objection of a party"].) Petitioner noted he was a psychologist, and repeatedly referred to him as "Dr. Earnest." The court expressed its familiarity with his credentials. The court asked petitioner to stipulate to Dr. Earnest's credentials, and petitioner's only objection was to his ability to testify to "the need for these procedures"—not to his expert qualification on the issue of capacity.

Second, the court could consider Dr. Earnest's expert opinion on petitioner's capacity to consent, without having to hear only from the treating physician. The issue when determining whether an LPS conservatee has the capacity to give or withhold informed consent is whether conservatee can "understand" and "knowingly and intelligently act upon" (§ 5326.5, subd. (c)) information including "[t]he reason for [the] treatment" (§ 5326.2., subd. (a)), "[t]he nature of the procedures to be used in the proposed treatment" (*id.,* subd. (b)), "[t]he nature, degree, duration, and the probability of the side effects and significant risks . . . of such treatment" (*id.,* subd. (d)), and "[t]he reasonable alternative treatments" (*id.,* subd. (f)). (See *Riese, supra,* 209 Cal.App.3d at p. 1322.) The physician who explained the proposed treatment to the conservatee might be able to testify about their conversation and the conservatee's responses, behavior, and affect.

■ But because the basic issue is the conservatee's capacity—his *ability* to understand and make knowing, intelligent decisions—an expert in psychiatry, psychology, or a related field may also be able to express a relevant opinion. And the expert may base his opinion on any matter "whether or not admissible, that is of a type" that experts reasonably rely upon—including hearsay statements from the treating physician. (Evid. Code, § 801, subd. (b).) Whether the expert was present for the treating physician's conversation with the conservatee goes to the weight of the expert's opinion, not its admissibility. Similarly, whether that expert is a medical doctor with independent knowledge of the proposed treatment's benefits and risks goes only to the opinion's weight. The court did not err in admitting Dr. Earnest's testimony.

## DISPOSITION

The petition is granted. Let a peremptory writ of mandate issue directing the court to (1) vacate its order authorizing the public guardian to consent on petitioner's behalf to the amputation of his right second toe, and (2) set a new hearing limited to the issue of determining through admissible evidence whether the amputation is medically necessary.

The stay previously ordered is lifted. In the interest of justice, this opinion is final as to this court forthwith.

Moore, Acting P. J., and Aronson, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied May 9, 2012, S201103.