Filed 8/5/14  Conservatorship of Angelina S. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| Conservatorship of the Person and Estate of ANGELINA S. | |
| HUMBOLDT COUNTY PUBLIC GUARDIAN, Petitioner and Respondent, v. ANGELINA S., Objector and Appellant. | A141213 (Humboldt County Super. Ct. No. PR130329) |

After a bench trial, the trial court found appellant Angelina S. to be "gravely disabled" and appointed a conservator of the person and estate for her pursuant to Welfare and Institutions Code section 5350, a provision of the Lanterman-Petris-Short Act (LPS Act).[1]  Angelina does not contest the trial court's finding of grave disability— defined as being "unable to provide for . . . her basic personal needs for food, clothing, or shelter" as the result of a "mental health disorder" (§ 5008, subd. (h)(1)(A)).  Rather, she contends that the trial court's imposition of certain legal disabilities in connection with the conservatorship was not supported by substantial evidence.  Additionally, Angelina

---

[1]  All statutory references are to the Welfare and Institutions Code unless otherwise indicated.  We have abbreviated Angelina S.'s name to protect her privacy. (See § 5325.1, subd. (b); *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1008, fn. 1.) Section 5350 provides in relevant part that "[a] conservator of . . . the person and the estate may be appointed for any person who is gravely disabled as a result of mental disorder . . . ."

1

argues that the trial court erred in granting the conservator certain special powers authorized by section 2591 of the Probate Code to manage property of her estate. Finding the trial court's orders to be amply supported by the record, we affirm.

## I. BACKGROUND

On October 23, 2013, Angelina was placed on a 72-hour psychiatric hold pursuant to section 5150 after she was found yelling at people in the street and the police were called.[2] When law enforcement approached her, Angelina was speaking nonsensically and was unable to report any plans to care for herself. Specifically, she stated that she planned to stay at the Broadway Motel because she owned it, although this was not true. Later that day she was involuntarily admitted to Sempervirens, Humboldt County's inpatient psychiatric facility, after presenting as very agitated and disorganized and making delusional statements about methamphetamine. Specifically, she told Dr. Jasen Christensen, her admitting psychiatrist, that she was a type of god or "the God" and that she uses methamphetamine to "heal herself." On October 26, 2013, Angelina was served with a 14-day certification pursuant to section 5250, authorizing an additional period of involuntary treatment.

Thereafter, by letter dated November 5, 2013, Dr. Christensen requested that the Humboldt County Public Guardian (Public Guardian) institute temporary conservatorship proceedings with respect to Angelina "to provide additional time in a locked facility, to ensure medication compliance and for additional treatment to determine if this patient requires long term hospitalization." In Dr. Christensen's opinion, Angelina was, at that point, gravely disabled due to a "pervasive self-care deficit exacerbated by mental

---

[2] Pursuant to subdivision (a) of section 5150, "[w]hen any person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer . . . or professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services."

illness." Additionally, he recommended that the Public Guardian be given the power to make informed consent decisions regarding Angelina's medications and treatment.

On November 8, 2013, the Public Guardian filed a petition seeking appointment as Angelina's conservator under the LPS Act due to her grave disability and unwillingness to accept voluntary care. (See generally § 5000 et seq.) The petition further requested that the court impose certain disabilities on Angelina pursuant to section 5357 as set forth in the petition and in the Public Guardian's investigative report. Specifically, the petition sought curtailment of Angelina's rights to possess a driver's license, to possess a firearm, to enter into contracts, to refuse routine medical treatment unrelated to her grave disability, and to refuse treatment specifically related to her grave disability. (See § 5357, subds. (a), (b), (d), (e) & (f).) The investigator recommended imposition of these disabilities due to "Angelina's impaired thought process, delusions and need to take medications." In particular, the investigator opined that the Public Guardian should be given the right to involuntarily medicate Angelina if necessary due to her "labile mood and paranoid content which relate to her fixed delusions of being persecuted by the Devil as well as psychotic agitation and poor insight into her condition." Additionally, with respect to consent to medical treatment, the petition averred that it would be in Angelina's "best interest" to grant the Public Guardian the right to require Angelina to receive treatment, both routine care and treatment related to her grave disability.

The petition additionally asked that the Public Guardian be given the special powers set forth in sections 2590 and 2591 of the Probate Code to manage Angelina's estate. Finally, it requested that the Public Guardian be appointed temporary conservator of Angelina's person and estate pending a final determination of the matter. On November 8, 2013, the trial court issued an order appointing the Public Guardian as Angelina's temporary conservator. Letters of temporary conservatorship issued that same day.

The Public Guardian filed an amendment to the petition on November 14, 2013, which added contact information for certain of Angelina's relatives and clarified which special powers the Public Guardian was seeking pursuant to section 2591 of the Probate

3

Code. Specifically, the Public Guardian requested the following powers: the power to sell at public or private sale real or personal property of the estate (subd. (c)(1)); the power to purchase real or personal property (subd. (g)); the power to alter, improve, raze, replace, and rebuild property of the estate (subd. (h)); and the power to pay, collect, compromise, or otherwise adjust certain claims, debts, or demands upon the conservatorship or to arbitrate certain disputes (subd. (p)).

Angelina was personally served on November 19, 2013, with notice of the hearing on the conservatorship petition, which was initially scheduled for December 5, 2013. On December 5, Angelina's attorney appeared on her behalf, stated "[s]he objects," and agreed to the setting of a contested hearing on January 2, 2014. Angelina, however, failed to appear on the January 2 date. According to her attorney: "She chooses not to appear, and no amount of encouragement seemed to sway that position." The court therefore conducted the hearing in her absence.

The only witness at the January 2 hearing was Dr. Christensen, who testified regarding his opinion that Angelina was gravely disabled.[3] According to Dr. Christensen, Angelina had been diagnosed as schizophrenic for at least the last 10 years. Since 2002, she had been involuntarily admitted to Sempervirens on 18 prior occasions, either as a danger to herself, as a danger to others, or as gravely disabled. Dr. Christensen, himself, had discharged her on four occasions during the month prior to her most recent hospitalization, either from Sempervirens or from the psychiatric emergency room. He reported that Angelina's illness caused her to experience a "pretty complex delusional system." For instance, she believes that she is the creator of the Earth and the universe. Additionally, Angelina reportedly believes that she has lived for " 'zillions' " of years and "holds herself responsible for making sure that healings take place all over the world, so she's frequently stopping conversation to heal animals and people elsewhere in the world . . . ." Because Angelina's "delusions seem to get into pretty much ever[y] area of conversation," she has trouble communicating rationally. As Dr. Christensen described

---

[3] Angelina's counsel stipulated that Dr. Christensen was qualified to render an expert opinion as to Angelina's "mental state and the need for an LPS conservatorship."

4

it: "So I run up against what I would call like a rational block really where you present her with some evidence, and then what's the—what would be the rational conclusion of this evidence, and, you know, nine times out of ten or ten times out of ten, it would be a certain answer, but she can't provide that answer because of the delusional process." According to Angelina, those who contradict her delusions are " 'not my creations' " but those of " 'snake devils.' "

Although the medication prescribed for Angelina had helped somewhat with her agitation, it had not reduced her delusional thinking. And, in fact, Sempervirens had discharged her "many times" in the past while she was still delusional. In Dr. Christensen's opinion, Angelina's delusions could be expected to improve with longer term treatment, but she had never been hospitalized for longer than the two months of this current involuntary commitment. Dr. Christensen believed that Angelina would never accept voluntary treatment in the future as he could find no evidence that she had ever accepted it in the past. Moreover, her denial of her mental illness made it difficult for her to care for herself. For instance, Dr. Christensen previously reported that she does not understand how her recurrent relapses with methamphetamine negatively impact her mental health, variously denying methamphetamine use, claiming that her body " 'produces' " the chemical, and stating that she uses methamphetamine in her " 'healing rituals.' "

Dr. Christensen also testified regarding the impact of Angelina's mental illness on her ability to provide herself with adequate food, clothing, and shelter. Although she receives Supplement Security Income (SSI), in Dr. Christensen's opinion, Angelina is incapable of budgeting that income to provide for her basic needs. Nor does she have the ability to negotiate what she would need to do to have an apartment or provide for food. He reported that every time Angelina was brought to Sempervirens by the police, her clothes were torn and she was often missing clothing appropriate for the weather. Moreover, according to Dr. Christensen, Angelina was "usually so filthy that it's difficult for us to be near her to examine her . . . ." Further, while she had lived in the past with a friend in a mobile home, that support was no longer available to her, and she had been

5

sleeping outside for at least the last several months prior to her most recent hospitalization. She told Dr. Christensen that, if she was released, she would continue to stay outdoors. It was the doctor's opinion that Angelina's mental disorder rendered her unable to provide for her own food, clothing, and shelter. Although Dr. Christensen admitted that Angelina had been a borderline case in the past with respect to grave disability, she had lost 20 pounds in the six months prior to her current hospitalization and he was worried that she was currently unable to find food consistently. Indeed, when Angelina was hospitalized in early October 2013, she had a shopping cart containing food mixed with trash. The police were particularly concerned because everything was mixed together, and some of the food was rotten. A similar situation existed at the time of her current hospitalization. However, since being hospitalized, she had gained a "fair amount" of her weight back.

Finally, significant evidence was adduced at the hearing that Angelina's delusional system could lead to violence. For example, Dr. Christensen testified that Angelina "believes she can send people to nonexistence, which is what she threatens a lot frequently." Moreover, in the past she had entered other people's homes because, as part of her delusional system, "she believes she owns several houses in Eureka and several hotels, and so she doesn't see anything wrong with entering those places, because she feels she is the owner . . . ." Further, at the time of her 2002 admission to Sempervirens, Angelina had threatened to kill her family. Apparently, due to her belief that she is God she sees herself as having "a lot of powers, super powers, and so at the time she felt her family was trying to take her powers from her, that's the reason she threatened them." And, in 2012, Angelina threatened to burn down a neighbor's house as a result of her delusions. Finally, during her admission to Sempervirens immediately prior to the admission that formed the basis for these proceedings, Angelina was found hitting her head against a fence.

At the conclusion of the January 2 hearing, the trial court found Angelina to be gravely disabled under the LPS Act. On January 6, 2014, the court signed an order finding the facts alleged in the petition to be true and appointing the Public Guardian as

6

conservator of Angelina's person and estate. The order expressly granted the Public Guardian the following powers: to detain Angelina for intensive treatment; to require Angelina to receive treatment related specifically to remedying or preventing the recurrence of her grave disability; and to require Angelina to receive routine medical treatment unrelated to her grave disability. In addition, the order imposed legal disabilities on Angelina's privilege to operate a motor vehicle; her right to enter into contracts; and her right to possess a firearm. Angelina retained her right to vote. Finally, the "Letters of Conservatorship" filed January 6, 2014, granted the Public Guardian the special powers for managing Angelina's estate that she had requested pursuant to section 2591 of the Probate Code. Angelina's timely notice of appeal brought the matter before this court.

## II. DISCUSSION

### A.    *Legal Disabilities*

It is beyond dispute that individuals do not forfeit legal rights or suffer legal disabilities merely because they have been found to be gravely disabled and conservatorships have been established for them. (§ 5005; *Conservatorship of Alfred W.* (1989) 206 Cal.App.3d 1572, 1578 (*Alfred W.*).)[4] Rather, in each instance, the court must "separately determine the duties and powers of the conservator, the disabilities imposed on the conservatee, and the level of placement appropriate for the conservatee." (*Conservatorship of Christopher A.* (2006) 139 Cal.App.4th 604, 612 (*Christopher A.*); see also §§ 5357, 5358.) In this regard, "[t]he party seeking conservatorship has the burden of producing evidence to support the disabilities sought, the placement, and the powers of the conservator, and the conservatee may produce evidence in rebuttal. [Citation.]" (*Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 165 (*George H.*).)

---

[4] Although *Alfred W.* was first published using the full name of the conservatee, it was reportedly later modified to substitute an initial for the conservatee's last name. We adopt this approach for the privacy reasons set forth in footnote 1, *ante*.

7

Relying on *Alfred W.*, Angelina argues that the trial court's order in the present case with respect to disabilities must be reversed or remanded because the Public Guardian failed to meet her burden of producing evidence in support of the each of the special disabilities sought. *Alfred W.* involved reappointment proceedings for an existing conservatee. (*Alfred W.*, *supra*, 206 Cal.App.3d at p. 1574.) In that case, although the reappointment petition did assert that imposition of the requested disabilities would be in the conservatee's best interests, this was apparently the only mention of the matter in the record prior to the court's order imposing them. (*Id.* at p. 1575.) In particular, no mention of the disabilities was made at the hearing. (*Id.* at p. 1578.) Under these circumstances, the Fifth District Court of Appeal opined that "[t]he better practice is for the conservator to disclose, by the questions asked or the argument made, the evidence relied upon to support special disabilities under section 5357." (*Ibid.*) Ultimately, since "no factual basis was specifically offered to support the disabilities imposed," the *Alfred W.* court concluded that remand was necessary for further proceedings to determine their appropriateness. (*Id.* at pp. 1574, 1579.)

In *George H.*, in contrast, the Second District Court of Appeal concluded under similar circumstances that a specific, on-the-record statement of the reasons for each order imposing a disability under section 5357 is not legally required. (*George H.*, *supra*, 169 Cal.App.4th at p. 165.) Rather, the court chose to follow the "usual rules on appeal" and " 'presume in favor of the judgment every finding of fact necessary to support it warranted by the evidence [citation].' " (*Ibid.*) Since the trial court had "properly specified each of the powers and disabilities it imposed" and the evidence supported those orders, there was no error. (*Ibid.*)

The present case is factually distinguishable from *Alfred W.* because, although no mention was made of disabilities at the hearing, the Public Guardian's investigative report did expressly state reasons why each of the requested disabilities was being

8

sought.[5]  Moreover, while we certainly agree that the "better practice" would be to create an express record in the trial court with respect to disabilities, we find *George H.*'s treatment of the issue at the appellate level to be the more persuasive.  We will therefore analyze the evidence supporting each disability at issue and will affirm its imposition if warranted by that evidence.  (See also *Conservatorship of Amanda B.* (2007) 149 Cal.App.4th 342, 347-348 [substantial evidence must support the findings underlying the imposition of a disability].)

  **1.**  ***Right to Possess Firearms.***

  Generally speaking, to support a limitation on a conservatee's ability to possess a firearm or deadly weapon, the court must find "that possession of a firearm or any other deadly weapon by the person would present a danger to the safety of the person or to others."  (§ 8103, subd. (e)(1).)  In addition, when a person is admitted into a mental health facility under section 5150 as a danger to self or others, that individual may not own, possess, control, receive, or purchase firearms for five years after release from the facility.  (§ 8103, subd. (f)(1).)  Given the uncontradicted evidence of Angelina's numerous admissions under section 5150 (sometimes for grave disability, sometimes for danger to self, and sometimes for danger to others), it seems likely that she was already statutorily prohibited from owning a firearm.  Even in the absence of such a blanket prohibition, however, we find that substantial evidence supports imposition of this

---

[5]  In her reply brief, Angelina asserts that the Public Guardian's reliance on information contained in the conservatorship investigator's report was error because such reports are inadmissible hearsay under *Conservatorship of Manton* (1985) 39 Cal.3d 645, 649-652 (*Manton*).  Pursuant to *Manton*, the hearsay evidence in such reports is inadmissible at a contested hearing or trial on grave disability.  (*Id.* at p. 652.)  A proposed conservatee, however, has a right both to a hearing or jury trial on the issue of grave disability and to a court hearing to determine placement, disabilities, and conservator duties and powers.  (*Christopher A.*, *supra*, 139 Cal.App.4th at p. 612.)  It is not at all clear that *Manton* is applicable in the context of a court hearing on disabilities.  (See § 5354 [court may receive and consider investigator's report at conservatorship hearing].)  Regardless, we do not reach the issue because Angelina failed to raise it in the trial court.  (*Scott S. v. Superior Court* (2012) 204 Cal.App.4th 326, 342 [hearsay evidence inadmissible absent waiver by the parties].)

9

disability by the trial court. The Public Guardian's conservatorship investigator recommended that Angelina be denied the right to possess a firearm due to her "impaired thought process, delusions and need to take medications." And, indeed, Angelina's history—grounded in her delusional system—of entering homes that do not belong to her, threatening to kill people or send them to "nonexistence," threatening to burn down a neighbor's home, and engaging in self-harming behavior such as hitting her head against a fence clearly supports the conclusion that she could be a danger to herself or others if in possession of a deadly weapon. We therefore find that substantial evidence supports the trial court's implied finding that she could not safely possess a firearm.

### 2. *Right to Operate a Motor Vehicle.*

Pursuant to subdivision (c) of section 12806 of the Vehicle Code, any person who has a "mental disability, disease, or disorder which could affect the safe operation of a motor vehicle" may be denied the privilege of possessing a driver's license. The Public Guardian's conservatorship investigator recommended that Angelina be denied the right to operate a motor vehicle for the same reasons she felt Angelina should not possess a firearm, and the violent content of Angelina's delusional thoughts as well as her inclination towards self-harm outlined above support the motor vehicle disability as well. In addition, Angelina's methamphetamine abuse and her repeated loss of focus when she feels the need to heal animals and people in other parts of the world both strongly support the trial court's implied finding that she could not safely operate a motor vehicle.

### 3. *Right to Contract.*

Under Civil Code section 1556, persons of "unsound mind" are not capable of entering into contracts. Being of "unsound mind" has been variously described as being entirely without understanding (Civ. Code, § 38); being of unsound mind, but not entirely without understanding (Civ. Code, § 39, subd. (a)); or being susceptible to undue influence due to "weakness of mind" (Civ. Code, § 1575, subd. (b)). (See *Smalley v. Baker* (1968) 262 Cal.App.2d 824, 834-835, disapproved on another point in *Weiner v. Fleischman* (1991) 54 Cal.3d 476, 485-486.) Pursuant to subdivision (b) of Civil Code section 39, a rebuttable presumption that a person is of unsound mind exists "if the

10

person is substantially unable to manage his or her own financial resources or resist fraud or undue influence." Here, the evidence indicates that Angelina suffers from paranoid and grandiose delusions involving her financial situation, believing that she has millions of dollars which the bank had stolen from her and that she owns "half of Eureka." Moreover, in Dr. Christensen's opinion, Angelina is incapable of budgeting her SSI benefits to provide for her basic needs and does not have the ability to negotiate what she would need to do to have an apartment or provide for her own food. This is substantial evidence supporting a finding of unsound mind and thus the denial of Angelina's right to enter into contracts.

### 4. *Right to Refuse or Consent to Medical Treatment.*

In *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303 (*Riese*), the First District Court of Appeal outlined the factors to be evaluated by a trial court when considering whether a gravely disabled person is incapable of making medical treatment decisions, including: "(a) whether the patient is aware of his or her situation (e.g., if the court is satisfied of the existence of psychosis, does the individual acknowledge that condition); (b) whether the patient is able to understand the benefits and the risks of, as well as the alternatives to, the proposed intervention . . . . ; and (c) whether the patient is able to understand and to knowingly and intelligently evaluate the information required to be given patients whose informed consent is sought (§ 5326.2) and otherwise participate in the treatment decision by means of rational thought processes." (*Riese, supra*, 209 Cal.App.3d at pp. 1322-1323; see also *K.G. v. Meredith* (2012) 204 Cal.App.4th 164, 180 (*K.G.*) [before trial court may impose a medical disability pursuant to subdivision (d) of section 5357 the "court must find that the conservatee . . . is incapable of making rational decisions about medical treatment related to his or her own grave disability, that is, lacks the mental capacity to rationally understand the nature of the medical problem, the proposed treatment, and the attendant risks"].)

In *K.G.*, the First District Court of Appeal held that a finding of decisional incapacity with respect to medical treatment decisions need not be express. (*K.G., supra*,

204 Cal.App.4th at p. 179.) Rather, the *K.G.* court concluded that "the record must disclose that the trial court was aware of the finding it was required to make before imposing the disabilities, that it considered the evidence proffered on the issue, and that it in fact made the finding. [Citation.]" (*Ibid.*) In this case, Dr. Christensen specifically recommended that, in addition to a conservatorship based on grave disability, the Public Guardian be given the power to make informed consent decisions regarding Angelina's medications and treatment. In addition, the Public Guardian's investigator requested the additional power to medicate Angelina against her will due to her labile mood, paranoid delusions, psychotic agitation and poor insight into her condition. And, the trial court expressly provided—in its order appointing conservator—that the Public Guardian be given additional powers to require Angelina to receive medical treatment, both routine medical care and treatment related specifically to her grave disability. Thus, the record supports the conclusion that the trial court was aware of the need to make additional findings regarding consent for medical treatment and, in fact, made those findings.

Further, the trial court considered significant evidence on the issue of whether Angelina had the decisional capacity to direct her own medical care. Importantly, Dr. Christiansen testified that Angelina's denial of her mental illness made it difficult for her to care of herself. Similarly, her delusional thinking resulted in a "chronic lack of insight" regarding how her methamphetamine abuse exacerbated her mental health issues, with Angelina variously denying methamphetamine abuse, claiming that her body " 'produces' " the chemical, and stating that she uses methamphetamine in her " 'healing rituals.' " Moreover, Angelina has significant trouble communicating and following a rational thought process due to her delusions. And her belief that she is a god who has lived zillions of years would certainly tend to undermine her ability to make rational decisions regarding her medical treatment. Under these circumstances, we conclude that substantial evidence supported the trial court's implied finding of Angelina's decisional incapacity with respect to her own medical treatment, whether it related to general care or to treatment for her grave disability.

12

In sum, all of the disabilities imposed on Angelina by the trial court were amply supported by the evidence, and we will therefore not disturb the trial court's disabilities order on appeal.

## B.    *Special Powers*

As a final matter, Angelina contends that the special powers granted to the Public Guardian pursuant to section 2591 of the Probate Code were not supported by the evidence. In particular, Angelina questions the court's evidentiary basis for granting the Public Guardian the power to sell her property; the power to "alter, improve, raze, replace and rebuild" her property; and the power to resolve certain claims, debts or demands. A trial court has the discretion to grant a conservator of the estate any of the additional powers specified in section 2591 of the Probate Code "if the court determines that, under the circumstances of the particular guardianship or conservatorship, it would be to the advantage, benefit, and best interest of the estate to do so." (Prob. Code, § 2590, subd. (a).) Where a matter is left to the discretion of the trial court, we apply the abuse of discretion standard of review. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 957.) Thus, "[w]e reverse the judgment only if in the circumstances of the case, viewed most favorably in support of the decision, the decision exceeds 'the bounds of reason' [citation], and therefore a judge could not reasonably have reached that decision under applicable law [citations]." (*Ibid.*)

Here, the record provides evidence sufficient to support the grant of the special powers requested pursuant to section 2591 of the Probate Code. Angelina's grandiose delusional beliefs regarding her financial situation (that she had millions of dollars which the bank had stolen from her), her inability to meet her basic needs despite the receipt of monthly SSI benefits, her torn and dirty clothing, and her lack of clothing appropriate for certain weather conditions all indicate that—in the management of her estate—it would be useful for the Public Guardian to have the power to buy, sell, and alter or replace her property. Further, given her belief that she is a deity, her view that those who contradict her delusions are "snake devils," her history of entering homes that do not belong to her, her threats to kill people or send them to "nonexistence," and her threat to burn down a

13

neighbor's home, it is not unreasonable to conclude that it would be advantageous to Angelina's estate to empower the Public Guardian to arbitrate disputes, settle claims in excess of $25,000, or compromise a claim involving physical harm to the conservatee. Under such circumstances, we see no abuse of discretion.

### III. DISPOSITION

The judgment is affirmed.

_____
REARDON, ACTING P.J.

We concur:


_____
RIVERA, J.


_____
HUMES, J.*

* Presiding Justice of the Court of Appeal, First Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.